# R. D. MILTON v. STATE.

No. A-1322.    Opinion Filed June 6, 1912.

(124 Pac. 81.)

1. FORGERY—Evidence—Weight.    In a prosecution for forgery in the first degree, the evidence is held to support the verdict, and that no reversible error was committed on the trial.

2. APPEAL—Refusal of Continuance.    The granting or refusal of a continuance in a criminal case is largely a matter of discretion of the trial court; and this court will not reverse the trial court on the decision of a matter which rests in the sound discretion of the trial court, unless it is shown that there has been an abuse of the discretion.

3. OATH—Administration of Oath—Powers of Court.    Every court has inherent power to do all things reasonably necessary for the administration of justice within the scope of its jurisdiction.

4. OATH—Power to Administer—Judges.    The judge of a superior court has power to administer oaths, without an express provision therefor by statute.

(Syllabus by the Court.)

*Appeal from Superior Court, Pottawatomie County;*
*Geo. C. Abernathy, Judge.*

R. D. Milton was convicted of forgery in the first degree, and appeals. Affirmed.

Plaintiff in error, R. D. Milton (hereinafter referred to as the defendant) was jointly indicted with one Felix J. Saxon and Eugene Walker in the superior court of Pottawatcmie county for the crime of forgery in the first degree. The indictment was returned August 23, 1909, and the case was continued from time to time until February 10, 1911, when it came to trial as to the defendant Milton; a severance having been requested and granted. The trial was concluded on February 15, 1911, and resulted in a verdict of guilty; and on February 20th the trial court pronounced and entered the judgment in accordance with the verdict, sentencing the defendant, R. D. Milton, to imprisonment at hard labor in the penitentiary for a term of seven years. From the judgment, the defendant appealed by filing in this court, on August 19, 1911, a petition in error with case-made.

A brief statement of the facts which the testimony tended to prove is as follows:

The time covered by the proof as to the facts of the immediate offense, from the beginning to the end, was the period of August 6 and 7, 1909. The scenes of the acts that led up to the offense were in the towns of Wewoka and Seminole, in Seminole county, and the surrounding country, and the town of Earlsboro and the city of Shawnee, and surrounding neighborhood in Pottawatomie county; the offense being consummated in the city of Shawnee, in Pottawatomie county. The chief actors were the defendants, R. D. Milton, Eugene Walker, and Felix J. Saxon, an unknown negro woman, and E. D. Reasor, then county judge of Pottawatomie county; the latter taking the acknowledgment; Saxon and Reasor being "used" by Milton, and being innocent of criminal intent.

Saxon was a young man, working at the time as stenographer to the county court of Seminole county. Milton was an older man, engaged at the time in dickering in allotments of Seminole and Creek Indians and negroes in the town of Wewoka. Dinah Walker was an old negro woman, living ten or twelve miles from the town of Seminole, and five or six miles from the town of Earlsboro, and sixteen or seventeen

miles from the city of Shawnee, in Seminole county. Eugene Walker was the second husband of Dinah Walker, and had previously served a term in the peniteniary, and was serving time in the penitentiary at the time of the trial.

On August 5, 1909, the defendant, Milton, approached young Saxon and told him that he (Saxon) had been in Wewoka for some time and had not bought any land; that he (Milton) wanted to see him (Saxon) make some money, and would help him get a start; that Dinah Walker had a lot of deceased Indian land, and they could buy some of it cheap; that if Saxon had a little money he could get in the deal; and that Saxon should get in and "get his feet wet."

The land described in the indictment had been allotted by the United States to three deceased children of Dinah Walker; and she had inherited the allotments upon the death of her children. There were three allotments of 120 acres each, or a total of 360 acres of land, lying in Seminole county.

On August 5, 1909, Saxon agreed that he would go into a deal; and it was understood between Milton and Saxon that they would go up to see Dinah Walker on the following day, August 6th. On August 6, 1909, Milton and Saxon took an early morning train at Wewoka and went to the town of Seminole, and obtained a team and drove to the home of Dinah Walker, going by the home of one Sam Norton, who lived about a mile from Seminole. While in Seminole, Milton was heard to make the remark, "This is a hell of a poor team to start a man out to steal a piece of land with." They stopped at the home of Norton, and conversed with him. A part of the conversation was had in the presence of Saxon, and a part of it was not. In the part that Saxon heard, Saxon and Milton told Norton they were going out to see about buying some deceased land from Dinah Walker, and asked him if he did not want to get in on the deal. Norton agreed to pay as much as $600, Saxon and Milton to put in their time, and Norton, Saxon, and Milton to share equally in the land.

Milton and Saxon left Norton, and drove to the home of Dinah Walker, where Milton went in and found only a sick girl,

and was informed by the sick girl that her mother, Dinah Walker, was at a neighbor's house, and that Eugene Walker was at or near Earlsboro. Milton and Saxon then drove, not to find Dinah Walker, but to Earlsboro to look for Eugene Walker. They ate dinner in Earlsboro, and learned that Eugene Walker was at a hay press about three miles from Earlsboro, toward the home of Dinah Walker. They started for the hay press, and a mile or two out met Walker in the road. horseback, coming toward Earlsboro. Milton hailed Walker, and had Saxon get out of the buggy and go up the road out of hearing, so that he could talk to Walker in private. Walker dismounted to talk with Milton. Milton had with him a pint of whisky, in a pop bottle, that he had gotten at Seminole or Earlsboro. The negro drank of the whisky, and came to the point. Here Milton and Walker agreed that Milton and Saxon should drive back to Seminole; that Walker should go to Earlsboro and procure a negro woman to impersonate Dinah Walker; that they (Milton, Saxon, Walker, and the dummy woman) would meet at 8 o'clock that night in the road, near the house of a negro by the name of Si Jones, about a mile from Dinah Walker's home, and have the dummy impersonate Dinah Walker and execute and acknowledge a deed to the deceased allotments of Dinah Walker before Milton, who at the time was a notary public in Seminole county, Milton at the time telling Walker that Judge Campbell, of the federal court, had just rendered a decision against the land grafters, but that it was not then yet generally known; that they would also put in the deed a misdescription, so that Dinah Walker would not lose her land, and they could get the $600 consideration from the grantee, and that he (Eugene Walker) would make $600 before midnight. There it was also agreed between Milton and Walker that, in the event Walker could not obtain a dummy in Earlsboro, he (Walker) would hire and bring along a double team, so that they could drive to Shawnee and get a woman to make the deed.

When Saxon returned to the buggy, Milton and Walker were discussing bootleg whisky; and Saxon was informed that

Eugene Walker had agreed to get his wife to sell her land, for which they were to pay him $50, and that they were to meet that night at 8 o'clock at the house of Si Jones to make the deed, when Walker would have his wife present. and they would not go to the home of the Walkers, as there was a son-in-law of Dinah Walker there who would knock the deal. Milton and Saxon drove back to Seminole and got supper, and Walker rode to Earlsboro, to look for the dummy woman.

Walker, after trying two women at Earlsboro, failed to find a dummy, and hired the livery team for the drive to Shawnee; and the parties, Milton, Saxon, and Walker, met again at 8 o'clock that night on the road near Si Jones' place, and about a mile from the house of Dinah Walker. They told Saxon that Dinah Walker had gone to Shawnee to take her sick child to the hospital, and that they would have to go there to make the deal. Milton left Saxon in their buggy, and got out and got into Walker's buggy, and they all drove to a nearby negro house, and got him to drive the buggy of Milton and Saxon back to Seminole, as Saxon had promised to have it back at the stable by midnight; and the three men then got in Walker's buggy and drove to Shawnee, a distance between fifteen and seventeen miles, getting to Shawnee a little after midnight. Nothing was said about the deal in the hearing of Saxon on the trip, though Walker says Saxon slept a while on the road. and he and Milton talked a little.

On South Union avenue, in Shawnee, was a livery barn, a hamburger stand, and a negro rooming house in close proximity. They drove to the livery barn and tied their team in front of it, and again Saxon is separated from the other two. Saxon crossed the street to the hamburger joint and ordered a hamburger. He stayed there long enough to have it cooked, and ate half of it, before being joined by Milton and Walker. Meanwhile Milton and the negro, Walker, are arranging the scenes for the last act of the play. They went to the nearby negro rooming house. The house was full of negro men, sleeping on cots and over the floor, and here they found one negro

woman, besides the landlady. They told the negro woman what they wanted, assured her it was all right, and promised her $30 to help them. At first they failed; but after a great deal of parleying they succeeded in getting her to agree to sign the deed as Dinah Walker. They went back to the hamburger joint, and told Saxon that Dinah Walker was there, but they would have to wait until she dressed. The three men finally went to the negro house and upstairs; and again the negro woman held back, and it was some time, and with considerable difficulty, that they finally got her upstairs. In the meanwhile, Saxon was sleeping on the floor upstairs. The woman finally came to the head of the stairway and touched the pen, and they delivered to her a draft, there drawn by Milton upon Saxon, who had no money in the bank, for $600; and Saxon paid the woman $7.50 in money.

Milton filled out the printed acknowledgment on the back of the deed to sign it as notary himself, and then thought of the fact that he was not a notary in Pottawatomie county, and could not take the acknowledgment. Milton told Saxon this, and told him (Saxon) that he (Saxon) would have to get out and rustle a notary public. Saxon thought of Reasor, the county judge, a friend of his, and went to a nearby white hotel and phoned and got Reaser to come down. Bringing Reasor, the county judge, seems to have kind of worried the principal actors, and it was some time before they could be gotten together again. Here, again, Saxon was separated from the other two men; Milton handling the negroes, while Saxon got the judge. The judge came down to the white hotel, and Milton joined Saxon and the judge there, and told them that Dinah Walker had gone to the hospital to see her sick child, and that they would have to wait. After some time, then went back to the negro house, and again had to wait. They finally got the woman ready again, and Reasor and Saxon were taken into the negro house. The woman came to the door of her room, with her head muffled in a shawl, stated that she was Dinah Walker, talked over the matter, and while Milton held a smoky lamp

Reasor read over the deed to her and took her acknowledgment to it as Dinah Walker; she having already touched the pen to her mark and signature under the name of Dinah Walker. After the acknowledgment, one of the men was heard by the landlady of the house to tell the negro, Walker, and the woman to hurry and catch the train for Wewoka or Seminole. The transaction was concluded somewhere between 1:30 and 2 o'clock in the morning. Reasor and the two white men went back to the white hotel, and Reasor went home, taking the deed with him, for the purpose of putting his seal to the acknowledgment the next morning, which he did, and delivered the deed to Saxon the next morning; and Saxon filed it in the office of the register of deeds in Seminole county the next day, August 7th.

The deed, as introduced at the trial, had an erasure in the description, and the erasure was written over in ink. The deed was taken to Felix J. Saxon as grantee. Norton placed $600 in the bank to meet the draft, but ordered it paid to no one but Dinah Walker. Gene Walker forged Dinah Walker's name to the draft, but it was turned down. A number of witnesses testified that it was not Dinah Walker (in fact of the witnesses, all said it was not she) who signed the deed; and a number testified that she was at home with her sick child when it was made. Dinah Walker learned of the forgery on Sunday or Monday following, and Monday started trouble. Milton and Norton heard of this on Monday night, and went before day on Tuesday morning to Dinah Walker's house, with $600 borrowed money, to try and straighten up with Dinah Walker and get her to sign a second deed, although still contending that the former deed was valid. They failed; old Dinah locked herself in her house and would not talk to them; and at the time of this trial suits were pending in which she was seeking to recover her land from Norton, to whom Saxon deeded it the day after the forgery.

Saxon and Walker testified for the state in the trial of Milton.

The defendant, R. D. Milton, on his own behalf as a witness, testified, in substance, as follows: That he was 38 years of age, native of Kentucky; resided at Wewoka; was a notary public; did not know Dinah Walker, and saw her for the first time August 10, 1909, at Earlsboro. Made arrangement with Felix Saxon to go to Dinah Walker's house on August 5, 1909, to buy a one-eighth interest in a 40-acre tract for Judge Cobb. On August 6th went to Seminole with Felix Saxon on the train, and drove to Dinah Walker's house with Saxon, arriving there about 11 a. m. Asked where Dinah Walker and her husband were, and they said Dinah Walker was at a neighbor's house, and her husband had gone to Earlsboro. Met Walker on the road and asked him if he would help them to buy a piece of land from his wife, and he wanted to sell them her dead children's land. Arrangements were made for Walker to assist the defendant in buying the dead children's land from Dinah. That Walker told defendant to go back to Seminole and meet him that night. That Walker informed the defendant that night that his wife had gone to Shawnee with a sick girl, and Walker insisted that the defendant go to Shawnee with him to make the deal. That the defendant, Saxon, and Walker all agreed to go to Shawnee, which they did. Arriving there, they went to a negro rooming house and waited a considerable time for Walker's wife, who came upstairs after a while. After having the deed read over to her, she signed it by mark. That there was at no time any conversation between the defendant and Eugene Walker as to a misdescription in the deed and getting a woman to act as Walker's wife. The defendant denied any knowledge on his part of it not being the real Dinah Walker on the night the deed was signed. He testified to having acted in the utmost good faith in the matter, and knew nothing of the unlawful conduct of the witness Eugene Walker. He further testified that he did not believe the woman who signed the deed was the same woman that he now knew as Dinah Walker.

T. S. Cobb, as a witness for the defendant, testified, in substance, as follows: That he was county judge. Was in

Des Moines, Iowa, at the time the deed was taken. He had insisted on the defendant, Milton, seeing Dinah Walker to secure a one-fifth interest in a certain 40 acres of land.

*L. G. Pitman, T. G. Cutlip, Crump, Skinner & Fowler.* and *J. Ross Bailey,* for plaintiff in error.

*Chas. West,* Atty. Gen., and *Smith C. Matson,* Asst. Atty. Gen. (*James E. Gresham* and *Hunter Johnson,* of counsel), for the State.

DOYLE, J. (after stating the facts as above). Upon a careful consideration of the evidence, our conclusion is that the verdict and judgment must stand, unless the court, in the course of the trial, committed error prejudicial to the substantial rights of the defendant.

It is claimed by the learned counsel for the plaintiff in error that the court erred in refusing to grant a continuance on account of the absence of the witness H. H. Rogers and the witness Mrs. Myrtle Milton, and the consequent absence of material and necessary evidence for the defendant, and on account of the denial of a continuance upon the indorsement of the names of additional witnesses upon the indictment at the commencement of the trial.

The affidavit for continuance sets forth that if witness H. H. Rogers was present he would testify that Felix Saxon told him (Rogers) that he (Saxon) signed Dinah Walker's name to the deed; that Milton witnessed it; that Milton was not acquainted with Dinah Walker; that after Dinah Walker said that she did not execute the deed Milton came to him (Saxon) and wanted him to reconvey, but that he (Saxon) said that he would not reconvey until Norton paid him; that he (Saxon) had paid all the money, and that he (Milton) was out nothing; that if Myrtle Milton was present she would testify that Felix Saxon had said to her that he (Saxon), with Milton, went to Shawnee, where they met Dinah Walker; that Dinah Walker there made her mark to the deed, and that he (Saxon) guided her hand as she did so; that he knew it was

Dinah Walker, and that Milton was not acquainted with Dinah Walker; that the deed was executed properly in the presence of Eugene Walker and R. D. Milton, and acknowledged before E. D. Reasor, county judge.

The record shows that the defendant Milton took the stand as a witness in his own behalf and corroborated Saxon in every particular mentioned in the affidavit for a continuance; and the defendant admitted as a witness that it was not Dinah Walker who signed the deed at Shawnee. He also testified that he saw Saxon put the money in the bank to pay for the land; and that it was Norton's money. He further testified that on Tuesday, August 6, 1909, he went with Norton, with $600 in money that they had borrowed, and tried to get another deed from Dinah Walker.

The only possible competency or materiality of the testimony of these absent witnesses would have been to impeach Saxon's evidence; and the defendant not only did not cross-examine Saxon on these points, but in his own personal testimony corroborated Saxon.

The names of five witnesses were indorsed on the indictment when the case was called for trial, leave of court having been first obtained, as follows: Alexander Crane, Carry Cyrus, Blanche Miller, Henryetta Brooks, and J. G. Dodson. The first two, Alexander Crane and Carry Cyrus, did not testify at all. Henryetta Brooks and Blanche Miller testified that Dinah Walker did not leave home the night of August 6th, and consequently could not have been in Shawnee to sign the deed in question. As this was an admitted fact by the testimony of the defendant, he could not have been prejudiced by their testimony.

J. G. Dodson (T. D. Dodson), the fifth witness indorsed thereon, testified that upon the afternoon of the night of the forgery he (witness, who was then sheriff of Seminole county) was at Seminole, Okla., and saw the defendant Milton and Saxon driving away from that place, and heard the defendant Milton, referring to the team he and Saxon were driving, re-

mark, "This is a hell of a poor team to start a man out to steal a piece of land with." After Dodson had testified, the defendant, testifying in his own behalf, did not deny making the statement that Dodson had testified to. Dodson testified that there were fourteen or fifteen men who heard the defendant make the remark.

The record shows that the trial lasted three days after Dodson testified; and no effort is shown to have been made to secure the attendance of any of these persons from the town of Seminole, just a few miles from Shawnee, where the trial occurred. No attempt was made on the motion for a new trial to show that the testimony of Dodson could possibly have been rebutted. We do not think that the defendant could have been prejudiced by the ruling of the court, when he did not deny this evidence when testifying in his own behalf.

It is further contended that the defendant was not in a mental condition to go to trial on account of the illness of his wife; and in support of the application for continuance evidence was introduced upon this point. The brief of the plaintiff in error, under this assignment, does not argue this question, and we suppose it is abandoned. Suffice it to say that at the time of the trial of this case it had been pending nearly two years, and during all that time the defendant had been represented by his present large array of counsel. During that time, the case was passed over at various terms for various reasons. The case was set for trial and prepared for trial by the defendant and his attorneys, and the witnesses subpoenaed at least twice before called for trial, to wit, in June, 1910, and in January, 1911. The record discloses that the case had been set down for trial once before at the same term of court at which it was tried, and was passed by the court, without motion, on account of the illness of the wife of the defendant.

The rule is well settled that the granting or refusal of a continuance, particularly for causes not enumerated in the statute, is a matter largely within the sound discretion of the trial court; and nothing but the abuse of this discretion will warrant

the appellate court in interfering with the judgment.    We think the application for a continuance was properly overruled.

Several assignments of error are based upon the fact that the judge of the court administered the oath to the bailiff in charge of the jury.   It is contended that:

"The court, by the judge, had no authority personally to administer the necessary oaths to the jury bailiff, but should have required the clerk to administer the oaths."

Our statute is silent as to designating what particular officer of the court shall administer the oath to the bailiff in charge of the jury.   It is fundamental that every court has inherent power to do all things which are reasonably necessary for the administration of justice within the scope of its jurisdiction. Therefore it is not necessary that there should be a statute empowering the courts to administer oaths in the trial of cases; the judge himself may administer the oath, or he may direct the clerk or deputy clerk to administer it.

"A court has inherent authority to administer an oath or affirmation; and an oath administered by an officer in open court, under the direction of the court, is administered by the court."   (29 Cyc. 1300, subpar. B.)

"The authority to administer oaths is, however, an incident to all courts.    It belongs to all courts.    Whenever a court is created, that power is also necessarily created as being a necessary incident to the court."   (*Ferguson v. Smith,* 10 Kan. 396.)

"We must know judicially that the court had authority to administer the oath, either by the judge, the clerk, or deputy." (*Keator v. People,* 32 Mich. 484, 487.)

It was held in *United States v. Ambrose* (C. C.) 2 Fed. 556, that a judge of a district court of the United States had the power to administer oaths in matters arising in the court; and that such power is incident to his judicial office, although it appears from the opinion that such powers had not been vested by statute in such judge.   Counsel's contention is destitute of merit.   All that is necessary is that the oath was administered by the judge or the clerk of the court in the presence of the court.

To the instructions given by the court, no serious objection is made; but it is insisted by the learned counsel that these instructions did not fully define the crime of forgery. The court gave fifteen instructions; the seventh and eighth being given on the request of the defendant.

Instruction No. 1, as given, reads as follows:

"Gentlemen of the jury, the court instructs you that in this case the defendant, R. D. Milton, is prosecuted by the state of Oklahoma upon an indictment, duly and legally filed and presented in this court, charging that he did, on the 7th day of August, 1909, and within the county of Pottawatomie, state of Oklahoma, and within the jurisdiction of this court, commit the crime of forgery in the manner and form as follows, to wit: That on said date R. D. Milton, Felix Saxon, and Eugene Walker then and there unlawfully, willfully, and feloniously did falsely and fraudulently make and forge a certain warranty deed, in words and figures describing certain lands, the property of Dinah Walker; that said warranty deed purports to be the act of Dinah Walker; that said warranty deed purports to convey the interest of said Dinah Walker in and to the lands therein described; that Dinah Walker did not sign said deed, and did not authorize any person to sign said deed for her; that said deed was by said persons made and forged with the unlawful, willful, and felonious intent of said persons then and there to defraud the said Dinah Walker of her interest in and to said lands described in said deed, contrary to the form of the statutes in such cases made and provided, and against the peace and dignity of the state of Oklahoma. You are instructed that to the indictment herein the defendant has pleaded not guilty, and you are instructed that the state must prove to your satisfaction, beyond a reasonable doubt, each and every material allegation of the indictment charging the offense against the defendant on trial."

Instruction No. 4 reads as follows:

"You are instructed that if you find from the evidence, beyond a reasonable doubt, that the defendant, R. D. Milton, entered into an agreement with one Eugene Walker that said Walker should procure some person, not Dinah Walker, to sign and acknowledge a deed conveying the lands described in the indictment herein, and if you further find from the evidence, beyond a reasonable doubt, that, pursuant to said agreement, the said Walker, acting alone or in conjunction with the said

R. D. Milton, procured and caused some person, on or about the 7th day of August, 1909, in the city of Shawnee, Pottawatomie county, Oklahoma, at the rooming house of one Sylvia Tutley, to sign and acknowledge the deed to such lands, as alleged in the indictment, and if you further find from the evidence, beyond a reasonable doubt, that such person so signing and acknowledging such deed was not Dinah Walker, and if you further find from the evidence, beyond a reasonable doubt, that the defendant, R. D. Milton, caused or procured such person, or aided and abetted in the causing or procuring such person, to sign such deed, with the intent to defraud Dinah Walker of her land, or of her interest therein, your verdict should be that the defendant is guilty. But, unless you find from the evidence, beyond a reasonable doubt, each and every matter mentioned in this instruction, your verdict should be that the defendant is not guilty."

We believe the instructions given by the court fairly and correctly state the law of the case. From the whole record before us, it is apparent that justice has been done by this defendant; and the judgment of conviction ought not to be set aside, except for such plain errors in the proceedings which were or might be prejudicial to the defendant.

Finding no such prejudicial error in the record, the judgment of the superior court of Pottawatomie county is affirmed.

FURMAN, P. J., and ARMSTRONG, J., concur.