## HENRY ADDINGTON v. STATE.

No. A-1345. Opinion Filed March 1, 1913.

(130 Pac. 311.)

1. APPEAL—Refusal of Continuance. An application for continuance in a criminal case is addressed to the discretion of the trial court; and its action thereon will not be disturbed, unless there appears to have been a clear abuse of discretion.

2. TRIAL—Furnishing Lists of Witnesses—Default—Failure to Object. Section 20 of the Bill of Rights provides: "In all criminal prosecutions the accused shall have the right * * * to be heard by himself and counsel, and in capital cases, at least two days before the case is called for trial, he shall be furnished with a list of witnesses that will be called in chief to prove the allegations of the indictment or information, together with their post

office addresses.'' **Held,** that it would be error to allow witnesses to testify against him in chief whose names have not been so furnished, if he seasonably asserts his constitutional right. But if he fails to object to going to trial on this ground, but announces ready for trial, he cannot afterwards avail himself of this objection; and the constitutional right given him by this section will be waived.

3.   **HOMICIDE**—''Dying Declarations.'' Proof that decedent was shot in the afternoon and died the next day about midday, that his wounds were necessarily fatal, and that he stated to persons present, immediately after he was shot, that he was dying, and that he expressed no hope of recovery, sufficiently shows that decedent appreciated the certainty and imminence of his impending death, and is, in itself, a sufficient predicate for the admission of his statements of the circumstances of the homicide as ''dying declarations.''

4:   **SAME**—Admissibility. Where decedent, mortally wounded and without hope of recovery, under the solemn conviction of impending death, makes several statements of material facts concerning the cause and circumstances of the homicide, one of which statements was reduced to writing, the prosecution is not confined to the written statement, but may offer evidence of other statements, whether the several statements were similar or not. Should any of said statements be inconsistent or contradictory, it is open to the defense to show this fact.

5.   **HOMICIDE** — Confronting Witnesses — Dying Declarations. The constitutional provision (Bill of Rights, sec. 20) that in all criminal prosecutions the accused shall ''be confronted with the witnesses against him'' refers to living witnesses, and not to dying declarations.

6.   **TRIAL**—Exclusion of Evidence—Harmless Error. The exclusion of evidence to prove particular facts is harmless, if the facts sought to be proved are subsequently proved by other evidence, and it is apparent that the evidence excluded could not have changed the result.

(Syllabus by the Court.)

*Appeal from District Court, McCurtain County;*
*Summers Hardy, Judge.*

Henry Addington was convicted of manslaughter, and appeals. Affirmed.

*Hosey & Leggett,* for plaintiff in error.

*Chas. West,* Atty. Gen., *Smith C. Matson,* Asst. Atty. Gen., and *Jos. L. Hull,* Special Asst. Atty. Gen., for the State.

DOYLE, J. Plaintiff in error, Henry Addington, hereinafter referred to as the defendant, was convicted of manslaughter

in the district court of McCurtain county on an information filed in said court on February 6, 1911, charging him with the murder of Boliver McWhorter, in said county, on or about December 18, 1910, and in accordance with the verdict of the jury was sentenced to serve a term of ten years' imprisonment in the state penitentiary. The judgment and sentence was entered on March 4, 1911.· To reverse the judgment, the defendant prosecuted an appeal by filing in this court, August 3, 1911, a petition in error with case-made.

In order to better understand the errors assigned, the following brief statement of the facts disclosed by the testimony is made, also extracts from the testimony of certain witnesses for the state and of the defendant, describing the immediate facts and circumstances of the homicide:

The deceased and the defendant, residents of Idabel, were, respectively, 21 and 18 years of age. The deceased, son of a Methodist minister, and the defendant, a store clerk, were rivals for the hand of one Miss Myrtle Suggs, which caused a misunderstanding. The evening before the killing there was a party at the Garrison home, about two miles from Idabel. That day the deceased received a note, warning him to be a little· slow, and that if he continued to take the stand which he had in the past he could have some one there to haul him home, signed "H. A." That evening they met at the party, and the deceased threatened to whip the defendant. The next day the defendant armed himself with a pistol, avowedly to settle with the deceased. After stating to several persons that he was looking for the deceased, he rode on horseback about a mile out of town and met the deceased coming to town. They talked for some time, and the defendant fired two shots at the deceased; one of them penetrating his bowels. The defendant then mounted his horse and rode back to Idabel, there meeting some of the persons he had talked to before leaving town. He said, "I killed him out on the big road."

Several witnesses testified to dying declarations, and a written statement was admitted, also. The written declaration was as follows:

"Dec. 18, 1910. I, J. B. McWhorter, being aware of approaching death, make this my dying statement: We, Henry Addington and I, met and were talking, and he said he had started to my house to settle a difficulty that we had had. I asked him to read a letter. He did so, and wanted to keep it, and drew his revolver. I remarked that he could shoot; that I had no arms. He put his gun in his pocket, and again drew it. I saw a buggy coming, and we walked up the road about a ¼ mile. We were comparing paper. I pulled off my glove to get the paper in my pocket, to get the paper, and he shot me. Had no knife in my hand. I asked him not shoot any more; he had shot me once. Made in the presence of C. T. Coonrod, Guy Short, C. H. Morris, A. F. Kerley."

W. M. Moore and two of his neighbors were standing in his yard, near the scene of the tragedy, and, hearing the first shot, their attention was directed to where the shot was fired. They testified: That when the defendant fired the second shot he was advancing upon the deceased, who was backing away from him. That they went to where the deceased had fallen, and reached there with four or five other neighbors. The deceased said that he was dying and commenced to vomit, and asked for water. A search for weapons was made, but none found. Two doctors from Idabel appeared and placed the deceased in an automobile and took him to town, where he died the next day about midday.

The defendant, as a witness in his own behalf, testified: That his first quarrel with the deceased was at the store where he was employed on the Saturday evening before the tragedy, and that the deceased said to him, "You have been knocking on me;" and "I told him that I did not understand it," and he said: "You are; before I get through with you, if everything proves up like I think it is, you will have me to kill, or I will kill you." That about 8 o'clock he hired a horse and went to a party at Mrs. Garrison's, a couple of miles in the country. That his horse was turned loose, and he went out in the yard, where the deceased was standing, and asked who turned his horse loose. That the deceased said, "No one," but "you have sent to Idabel for officers." That the deceased said: "Come on down the road. I will settle that with you." And the defendant said, "I don't want to fight." That the deceased pulled a gun and said, "Now,

if you don't run, I am going to kill you," and came up to him and put his hand on his shoulder, and said: "Your mother and sister are both ladies; you are a G—— d—— son of a b——; right here is where we get together." And the defendant said: "I am not able to fight you fair; all you hold in your hand is all that keeps me from getting on you right here." That the deceased turned around with two or three oaths and said: "No; he will not fight." That the next day, after dinner, he went to the livery stable and got a horse and started to Bill Mayhall's.

The record then shows his testimony to be as follows:

"Q. Why were you going to Bill Mayhall's? A. Going to Bill Mayhall's to see the one that made up the party on Saturday night and asked me to go. I goes out there to see him. I was going to see if he would give another party, and I wanted to see him to see if he asked me, or merely told these boys to ask me, or merely told me to come. I don't know whether I was invited or not. I was going to see him to see whether I was invited before I said anything about the racket between me and Boliver McWhorter. Q. Begin and state what occurred from the time you left town on that trip. A. I gets out of town. Something near a mile out southwest of town here two boys were standing on the roadside, Belton Taylor, and Suggs, I think, made the remark if I knew who Boliver McWhorter was; I said 'Yes' and sort of laughed; I was going in a close place, but managed to get out. They asked me where I was going. I said I was going to Mayhall's. 'Do you know where he lives?' 'Yes; but he has gone to Shawnee town in a wagon along about 2 o'clock.' I said, 'I am going to see him tonight.' I goes ahead and goes up a long lane and rode up a hill; it was about a quarter from where I met these boys there was a top of a hill. You couldn't see any one coming from the south, or any one going towards the north, until you both got nearly to the top of the hill. When I got up to the top of the hill, I seen McWhorter coming on the other side of the hill. There we were with a fence on both sides, and the only way I could get away was to go back the way I went. I thought I had best not do it, although I was thinking of what he had said the night before. I was going in a lope; I gets up pretty close together. He was headed north and me south. He turns his pony angling in the road in front of me and kind of pulled his glove off. I asked him what he was pulling his glove off for. Before he told me, he never said anything, but just started with his hand towards his pocket. I made for my

pocket. He stopped a minute and said, 'I haven't got anything
to harm you with.' I says: 'How do I know? You had last
night; I don't know what you have done with it.' I says: 'Don't
you go to your pocket; I am prepared today; I ain't going to let
you run over me today.' He looked up the road and saw a buggy
coming, and says, 'Yonder comes father and mother.' I kept my
eyes on him; I was afraid if I looked around he might get the
advantage of me; I was afraid of him on account of the way he
had done me. I gets down off my horse. He got down, and
he pulled a note out of his pocket, and I stayed on the west side
of my horse; I was still afraid. On that side I kept my horse
between us, provided he got out his gun, or anything else he may
have had. I looked at the note; I couldn't make out the words; I
told him I didn't know anything about the note. He says, 'I re-
ceived this at the post office yesterday evening.' I denied it,
and said if he could prove that I wrote the note I would make
him a present of $20 bill. He said: 'Let's walk on down the
road; I don't want that buggy to get closer.' I walks with him.
While I was looking at the note, my horse broke loose; it was
a scary horse. He started back down the road. I says: 'Yes; I
guess I will. My horse is loose; if I had my horse, I would go
on where I started.' He said, 'Where are you going?' I says,
'I am going down to see Bill Mayhall,' I said, 'I heard he was
going to Shawnee town.' He says: 'Yes; he is down there in a
wagon with some girls, in a wagon down the road.' He kept
talking about the note. I says: 'I don't know anything about it;
I don't have the least idea who wrote the note.' We came on up
the road; we passed a buggy; it was a negro and a white man;
it wasn't his father and mother. I was still looking; I was
scared of him. We came on up the road, I guess, a quarter from
where we first met; my horse got away from me. Q. Did you
turn back towards town? A. Yes; came on up the road, and I
stopped by the fence. We walked out of the road a little piece.
Some people come along in a wagon. I always kept him in front
of me some way, so I could watch him. He says, 'Have you a
book in your pocket?' We didn't say but a few words there;
he kind of walked around, and kind of got angling a little to the
left of me. The fence run north and south, and the road run
the same; the woods was right east of us towards town. He
come a little northwest of me, and was standing talking, and I
was standing by the fence, with my arm upon the fence. He
was standing nearly in front of me. I was watching him all
of the time. He said the trouble wasn't nothing; one or the
other of us would have to go to our grave. I says: 'I don't

want to die; I am in the prime of life; I suppose you are.' While I was in my pocket to get out everything I had—I was going to show him in regard to that note; I had been trying with my head down; I had a little book with some papers in my pocket; they had got crossways in my pocket—while I was trying to get them, there is where he got at me with the pocketknife. As he run up, I pulled my gun; I had it in my pocket. As I pulled it around, he caught it in his left hand. As he caught it, it fired. As he make a strike, I run backwards. When it fired, he turned the barrel loose; he made a strike. I fired, and hit him in the stomach or chest. He threw his hands up, and I backed up. He leaned over on his face; he says, 'Don't shoot me any more.' I says, 'I won't.' I laid my gun down, and put him down on the stump. I pulled his clothes out and saw where I had hit him. He says: 'I am going to die; get me a doctor.' I says, 'I will do anything for you.' I gets on my horse. I says, 'Which doctor do you want?' He says, 'McCaskell.' I telephoned for the doctor and telephoned for the sheriff to come out."

Lawrence Jones testified that a few days after the killing he went to the place of the shooting with Mr. Leggett, at his request, and Mr. Woods went with them to make a diagram of the place; that while he was there he found a pocketknife lying in the leaves, and he gave it to Mr. Leggett.

The first assignment of error is that the court erred in overruling the defendant's application for a continuance. The defendant's affidavit for continuance sets forth:

"That Albert Addington and Claud Addington live at Bethel, and Robert Addington lives at Lukfata, and that he has used due diligence to obtain the attendance of these witnesses; that he has been informed and believes that the state will attempt to introduce a note threatening the life of the deceased, purported to have been written and mailed to the deceased; that said witnesses are defendant's brothers, and are familiar with his handwriting, and if present would testify that the handwriting of said note is not his handwriting; that the defendant has not had said witnesses subpoenaed because of the fact that immediately after his examining trial he was taken to Hugo, and there placed in the county jail for safe-keeping, by reason of which he was unable to have free intercourse and discussion of his defense with his attorneys, Hosey & Leggett, who reside in Idabel; that he was brought from Hugo to Idabel upon convening of the district court at Idabel at the February, 1911, term thereof, was arraigned, and given one day in which to plead; that the district court was

adjourned before the fixing of a day for trial of this defendant in said term, and the defendant was then transferred to the county jail of Carter county, at Ardmore, and was not brought back to Idabel until the 27th day of February, 1911, on which day his case was assigned for trial, and he did not have an opportunity to talk with his attorneys and arrange with them for his defense herein, and has not been able to properly prepare for trial at this time and to obtain the above said witnesses herein by reason of that fact, and cannot at this time go to trial without said witnesses, and if forced to trial would not be given that fair and impartial trial that is guaranteed him by the Constitution."

It will be noticed that the defendant did not contend in said motion that he had not had sufficient time to prepare his defense, and the continuance is not asked on that ground. The allegations of the affidavit, as to the time allowed him for preparation, were made for the sole purpose of showing due diligence on his part in trying to obtain the testimony of these three witnesses, and did not contend that it injured him in any other manner.

Upon the hearing, the record shows the following proceeding:

"The Court: I will not overrule it; I will hold the matter open until you have an opportunity to get these witnesses. If they don't come, I will permit you to use that as a deposition. Are you gentlemen now ready to proceed with the understanding you have? Mr. Leggett: Yes; I guess so. The Court: The court will see that you have ample opportunity to get these witnesses."

Presumably the defendant had such opportunity; for nowhere else in the record is any complaint made against proceeding with the trial on this ground. On the other hand, the record shows that two of these witnesses were sworn and testified for the defendant. Besides these, four other witnesses testified to the same facts which the defendant expected to prove by the witnesses named in his affidavit for continuance.

"The rule is well settled that the granting or refusal of a continuance, particularly for causes not enumerated in the statute, is a matter largely within the sound discretion of the trial court; and nothing but the abuse of this discretion will warrant the appellate court in interfering with the judgment." (*Milton v. State,* 7 Okla. Cr. 407, 124 Pac. 81.)

The court certainly did not abuse its discretion in refusing the continuance in this case; nor was the defendant in any manner injured by the court's action.

The second assignment is "that the court erred in overruling the defendant's motion to dismiss the information against him," and the same objection goes to assignments Nos. 3, 4, and 5, and will here be considered as one.

These assignments of error are based upon the contention that a list of witnesses was not served upon the defendant as is required by the Constitution of the state of Oklahoma. Section 20, Bill of Rights, provides:

"He shall be informed of the nature and cause of the accusation against him and have a copy thereof, and be confronted with the witnesses against him, and have compulsory process for obtaining witnesses in his behalf. He shall have the right to be heard by himself and counsel; and in capital cases, at least two days before the case is called for trial, he shall be furnished with a list of the witnesses that will be called in chief to prove the allegations of the indictment or information, together with their post office addresses."

The record shows as follows:

"State of Oklahoma v. Henry Addington. Murder. Now, on this the 13th day of February, 1911, the defendant, Henry Addington, is present in open court in his own person and represented by his attorneys, Hosey & Leggett, and the defendant is arraigned by the information herein being read to him in open court by N. W. Gore, county attorney *pr tem.* of McCurtain county, Oklahoma; and the defendant says that his true name is Henry Addington, and asks and is by the court allowed a day in which to plead to the charge contained in said information; and thereupon the defendant, Henry Addington, is served in open court with a true and correct copy of the information herein, together with a list of witnesses, containing their post office addresses, to be called by the state to testify in chief in this case. Summers Hardy, District Judge."

The record further shows that on March 1st, when the case was called for trial:

"And now both the state and the defendant announce ready for trial, the state being present and represented by G. M. Barrett, county attorney of McCurtain county, Oklahoma, and T. A. Hope, and the defendant, Henry Addington, still being

present in open court and represented by his attorneys, Hosey & Leggett."

In the case of *State v. Frisbie, ante,* 127 Pac. 1091, it is held:

"Any person prosecuted in Oklahoma for a capital offense has the constitutional right to have furnished to him, at least two days before the trial begins, a list of the witnesses to be produced against him in chief by the state; and it would be error to force him into trial and allow such witnesses to testify against him whose names have not been so furnished, if he seasonably asserts his rights. But if he fails to object to going on trial on this ground, but announces ready for trial, he cannot afterwards avail himself of this objection; and the constitutional right given him by this provision will be waived."

See, also, *Blair v. State,* 4 Okla. Cr. 359, 111 Pac. 1003; *Starr v. State,* 5 Okla. Cr. 440, 115 Pac. 356.

On the face of the record, the objections made in these assignments are not well taken.

The sixth, seventh, eighth, ninth, and tenth assignments of error relate to the ruling of the court upon the admission of dying declarations, and will be considered together.

It is contended that "there is nothing in the record to show that the deceased made the statements under a sense of impending death." The record shows that the evidence when offered, was not objected to on this ground. However, we think the evidence conclusively shows such a sense of impending death as to make such dying declarations admissible. The record shows that he was shot Sunday afternoon, and died about midday Monday; that in the presence of seven or eight witnesses, who reached him immediately after the shooting, he said he was dying. Dr. McCaskell testified that he found his intestines punctured in eleven different places, and that he stated to witness several times that he knew that he was going to die. There is no testimony tending to show that he had any hope of recovery.

In the case of *Morris v. State,* 6 Okla. Cr. 29, 115 Pac. 1030, it is said:

"It is essential to the admissibility of dying declarations, and is a preliminary fact to be proved by the prosecution, that they were made under a sense of impending death. This may be made

to appear from what the injured person said, or where, from the nature and extent of his injuries, it is evident that he must have known that he could not survive. It is sufficient if it satisfactorily appears that they were made under the sense of impending death, whether it be directly proven by the express language of the declarant, or be inferred from his evident danger, or the opinions of the medical attendants, stated to him, or from other circumstances of the case, such as the length of time elapsing between the making of the declarations and his death, and the fact that the declarant was so weak that he could not sign his name and so affixed his mark, all of which are resorted to in order to ascertain the state of declarant's mind."

It is next contended that the court erred in admitting testimony as to an oral statement of the deceased, first admitted by the court and then rejected, because it appeared that the deceased had acquiesced in a written statement; and counsel insist that the error in admitting it was not cured by its rejection.

The oral statement made by the deceased, to which the witness testified, was made contemporaneously with the written statement admitted. The only material difference is that when the buggy was coming the deceased said: "There comes father and mother; don't let them see we are having any trouble; I would not have them know it for anything in the world." The only error was the ruling of the court rejecting the oral statement.

In *Morris v. State, supra,* it is said:

"We think the sound rule, supported by reason and authority, is that, where statements of material facts concerning the cause and circumstances of the homicide are made at different times by the victim, under the solemn conviction of impending death, one of which was reduced to writing, the prosecution is not confined to the written statement, but may offer oral evidence of the statements made at other times, whether the several statements were similar or not."

See Wigmore on Evidence, secs. 1332, 1449, and 1450; *State v. Carrington,* 15 Utah, 480, 50 Pac. 526; and 4 Encyc. of Ev. 1012, and notes.

We know of no law or rule that would confine either the state or the defendant to the written dying declaration, where other and different statements are made contemporaneously with the written declaration, or made subsequent thereto. Should any

of such separate statements be inconsistent or contradictory, it is open to the defense to show the fact.

"Dying declarations are statements of material facts concerning the cause and circumstances of the homicide, made by the victim under the solemn conviction of impending death, and as such are to be distinguished from other admissible declarations, such as declarations which constitute a part of the *res gestae,* or declarations made in the presence of the accused. Such declarations are admissible as evidence against the accused, because they were admissible at common law. The constitutionality of this rule has been so uniformly affirmed that the question is no longer an open one. They may be oral or in writing. Being a substitute for sworn testimony, they must be such narrative statements as would be admissible had the victim been sworn as a witness. Mere conclusions or matters of opinion or belief, which would not be received if the declarant was a witness, are inadmissible; and, upon objection properly made, such statements or clauses should be rejected. In the absence of a statute, the rule requiring a dying declaration to go in as a whole has no application here." (*Mulkey v. State,* 5 Okla. Cr. 75, 113 Pac. 532.)

The eleventh assignment is that the court erred in permitting the note, warning the deceased not to attend the party, to be admitted in evidence over their objection, for the reason that said note was not sufficiently identified to be admissible. There can be no doubt about its identification, if the evidence of the oral dying declarations be admitted. We have herein shown that this testimony was competent, and was erroneously rejected by the trial court after first being admitted. But in that part of the testimony which was allowed to go to the jury the witness Coonrod identifies this note as being the one he took out of the pocket of the deceased, and that he showed it to the deceased, who identified it as the one "that the racket came up over." This part of the testimony is not excepted to, and was not rejected by the court. The note was not admitted as proof of a prior threat of the defendant, but as a circumstance attending the shooting. The testimony on the part of the state and the defendant's own testimony show that the defendant and the deceased were looking at and discussing this note at the time the killing occurred. It was clearly competent as a part of the *res gestae.*

The last assignment is that the court further erred in refusing to allow witness W. H. Neal to testify as to the general reputation of the deceased for violence. The state objected, for the reason that no proper foundation had been laid in this: That the witness has not stated that he knew that the deceased lived at the place named, and that the time was too remote, being three or four years prior thereto.

If the court's ruling was erroneous, we think it was harmless, as the defense was allowed to offer proof as to decedent's reputation while living at Idabel; and the testimony of these witnesses was not contradicted by any evidence offered by the state. "The exclusion of evidence, whether it is or is not competent, is harmless, where it reasonably appears that its admission would not have affected the verdict." And: "The exclusion of evidence to prove particular facts is harmless, if the facts sought to be proved are subsequently proved by other evidence, and it is apparent that the evidence excluded could not have changed the result." 12 Cyc. 925 and 926, and cases cited in notes 85 and 87.

No complaint is made to the charge. The court instructed the jury fully and liberally for the defendant.

After a most careful review of the record, we have been unable to discover any prejudicial error. The defendant was convicted only of manslaughter in the first degree. As we view the record, his youth and the humanities of the law are all that saved him from a conviction of murder.

The judgment is affirmed.

ARMSTRONG, P. J., and FURMAN, J., concur.