## VAN PADEN v. STATE.

no. A-2521. Opinion Filed July 7, 1917.

(165 Pac. 1155.)

1. **HOMICIDE—Dying Declaration—Admissibility.** When all the facts and circumstances disclosed by the record establish the fact that a dying declaration was made at a time when deceased realized that death was impending, it is entitled to be admitted in evidence.

2. **APPEAL AND ERROR—Reversal—Instructions.** A judgment of conviction will not be reversed by this court on account of inaccuracies in the instructions, when it clearly appears that no harm did result or could have resulted to the accused by reason thereof.

*Appeal from District Court, Cherokee County;*
*John H. Pitchford, Judge.*

Van Paden was convicted of manslaughter in the first degree, and he appeals. Affirmed.

*J. I. Coursey* and *S. A. Horton,* for plaintiff in error.

*R. McMillan,* Asst. Atty. Gen., for the State.

ARMSTRONG, J.  Van Paden was tried in the district court of Cherokee county in February, 1915, on an information charging him with the murder of W. P. Sword, and convicted of manslaughter in the first degree. His punishment was fixed by the jury at imprisonment in the state penitentiary for a term of 18 years.

The following is a fair *resume* of the testimony:

G. W. McGowan, on behalf of the state, says that he is 40 years old, and lives at Park Hill, Cherokee county, Okla., about 300 yards southwest of Johnson's store; that he knew the deceased, W. P. Sword, in his lifetime; that he saw him at Johnson's store on the night of December 22d, and when he got to him he said he was shot; that he assisted in carrying him home; that C. W. Johnson was the only one at the store when he got there; Sword was sitting up on the porch, his feet hanging off; that it was a cold night; that he was about 175 yards away when the shots were fired; that Leslie Peace arrived immediately after he reached the scene.

A. A. Beard testified that he was a practicing physician located at Park Hill, in Cherokee county; that he knew W. P. Sword and was called to attend him at Johnson's store on the night of December 22d; that it was cold and damp at the store, and deceased was carried home before he gave him treatment; that an examination disclosed a gunshot wound in the body and one in the thigh; the bullet which entered the thigh came out, the other one did not; that he probed the wound for an hour or more, but could not locate the bullet; that it had entered the abdominal cavity and was sufficient to and did produce death; that this bullet entered about two inches above the hip bone and about two inches toward the median line

on the left side; that he attended the patient again the following morning in company with Dr. Duckworth, and again about 12 o'clock; that he informed the deceased that he did not know how serious his wounds were; that he had not been able to trace the bullet.

J. F. Duckworth testified that he was a practicing physician residing at Tahlequah; that he was called to attend W. P. Sword on the 23d day of December (he described the wounds just as did Dr. Beard); that judging from the wounds, the parties changed positions during the shooting; that the wound in the bowels entered the abdominal cavity and was sufficient to produce death.

Claud Sword testified that he was a son of the deceased and lived about 100 yards south of Johnson's store in Park Hill; that he had been hauling wood and got home about 5 o'clock; that he and his father went to the store; that he took some groceries home and went back after others, and was returning the second time with his father when they met Van Paden and Jim and Tom Miller; that his father asked Paden to pay what he owed his boys for cutting wood; that Paden replied that he would pay them when he got damned good and ready, and shot his father twice; that he went after Mr. Johnson, who had gone home, and when they returned to the store his father had climbed upon the porch and was sitting down; that he went for a doctor then, and when he got back his father was lying on the porch, and the neighbors carried him home; that he was 16 years old and had never been a witness before; that as he ran for Mr. Johnson he looked back, and his father was standing where he was shot; that Paden and the Millers were met near the house of J. S. Smith; that his father had a gallon of syrup in his right hand when he was shot; that

two shots were fired; that his father did nothing to Paden except to ask him to pay the debt.

G. W. Johnson, for the state, testified: That he was a merchant and lived at Park Hill, Okla., about 80 yards south of J. S. Smith; that he knew W. P. Sword and saw him in the store on the night of December 22d; that Sword left the store about 6:30 and went away with some merchandise; that deceased's boy ran to his house and told him that his father was shot and wanted him to come, and that he went and found him sitting on the porch at his store; that he ran up to him, and said, "What is the matter, Mr. Sword? Are you hurt very bad?"; that deceased replied, "Yes, I am killed"; that he unbuttoned deceased's clothes and laid him down on the porch, and as soon as other neighbors gathered in they carried him home on a cot; that deceased said he asked Van Paden what he was going to do about paying his boys, and Paden said he could not do it right then and shot him; that this statement was made a very short time after the shooting; that he did not find out where the wounds entered the body until they reached the home of the deceased; that he searched his clothes and found no arms of any kind; that the overcoat worn by the deceased was buttoned up, and his dress coat was also buttoned up.

J. S. Smith testified that he lived at Park Hill, and that he knew G. W. Johnson and lived about 80 feet from him; that he knew W. P. Sword during his lifetime; that about dark on December 22d he heard two shots close together, and at once opened the door, and some persons ran past the house going north; that he did not see, but heard them; that the moon was shining some; that in a few minutes Mr. Sword's boy came and told him that his

father was shot, and he went down in front of Johnson's store and found the deceased; that Sword was in a bad condition, and Johnson was holding him up, and his head was hanging limp; that he put his knees against the back of deceased and held him up and told Johnson to go and phone the officers, and Mr. McGowan came; that deceased then fainted away, and seemed not to be breathing, and Mr. Peace felt his pulse and thought he was dead; that witness also thought Sword was dead, but after considerable struggling he rallied and was carried home; that witness had not at this time heard how the difficulty arose; that early the next morning, before anybody passed, he examined the tracks where the tragedy occurred and found no blood.

Luther Jones, for the state, testified: That he was cashier of the bank at Park Hill, and that he knew the deceased in his lifetime, and saw him on December 22d, and was at his house when he gave the dying statement which was taken in his presence and identified by him; that Mr. Peace wrote it down at his request; that they asked questions, and Peace wrote the answers and then read them; that this was about 11 o'clock at night; that some of the older men in the community wanted witness to go down and take the statement, and they asked deceased if he wanted to make a statement, and he said he did, and would give it to them if he could; that he was suffering great pain, and at times said he could not stand it; that Mr. Peace and Mr. Latta were present when the statement was made and signed.

Mrs. Sword testified that she was the wife of deceased and lived at Park Hill on December 22d; that the deceased went to town about 4 o'clock, and got some groceries and did not come back until he was brought back fatally

wounded; that he had on an overcoat and a brown suit; that his clothes had been kept by her and were in the same condition at the time she was giving her testimony as they were in when deceased was killed; that deceased lived until the next day until 2 or 3 o'clock; that the clothing was examined by a number of neighbors at the time of the homicide; that her husband never carried arms, and was not armed on the night of December 22d when he was shot.

Mrs. Nettie C. Smith, for the state, testified that she lived at Park Hill and knew the deceased during his life-time; that she went to the window on hearing two shots, looked out, and saw a man running towards Johnson's store; that she then saw two parties running past her window and out of sight; that she saw them coming down first; and then they turned and went back, and she did not see them do anything when they went back, and when they came by they were running towards town; that on going back they just walked, and after they turned they ran; that she got to the window as quick as she could after hearing the shots; that it was only two or three steps.

The dying statement of the deceased was also introduced in evidence, objected to by the defense, and admitted by the court. It is as follows:

"PARK HILL, Okla. 12—22—1914.

"The affidavit of W. P. Sword taken at his residence in Park Hill, Okla.

"The affidavit of W. P. Sword, states that he had been up in town and had started home and met Van Paden between J. S. Smith's residence and Johnson's store, and I asked him when he was going to pay my boys for that wood cutting, and he said I will pay it when

I get ready, then he stepped back and got his gun and began shooting at me. I did not attempt to hurt him in any way. I had my arms full of groceries. The first shot he hit me I was facing him and when he shot me I wheeled and he shot me in the leg from behind me. He then ran off up the road. I then staggered on down the road to Johnson's store and lay down on the porch, until I was removed home by my neighbors. I had never had any trouble with Paden heretofore. It was so dark I could not see the pistol with which he shot me.

his<br>
"W. P. X SWORD.<br>
mark

"*Witness to mark*: LESTER PEACE.

"Attest: T. F. LATTA, *Witness to attest.*

"Subscribed and sworn to before me a notary public, in and for said county of Cherokee and State of Oklahoma, this 22d day of December, 1914.

"[Seal.]                    L. H. JONES, *Notary Public.*

"Commission expires Feb. 7, 1917."

On behalf of the defendant, Jim Miller was first called, and testified: That he lived at Park Hill with his grandfather, Jeff Paden, and that Van Paden was his uncle. That he was present at the trouble on December 22d. That he and his brother Tom and his Uncle Van Paden had started to the show. That near Johnson's store they met Sword and passed him about the southeast corner of Mr. Smith's garden; and that Sword called his Uncle Van Paden and asked him when in the hell he was going to pay the kids for cutting wood; and that his Uncle Van said, "I have told them all along I was going to pay them," and then he asked when in the hell was that going to be, and his Uncle Van said when he sold his cotton, and then Sword says, "By God, when is that going to be?" And his Uncle Van said, "When I get ready." That

then Sword hit him with his fist, knocked him down, and his hat fell off; that he fell to his knees, and Sword stepped towards him, and his Uncle Van shot him twice, and he walked off; that when Sword struck his Uncle Van, Claud ran off. That his brother and he were standing north of Paden at that time, and after the shooting they did not run, but just walked up the road; that he did not see anybody as he passed Mr. Smith's house. That it was a dark, cold night, and no moon. That there was a little snow on the ground. That his uncle was still on his knees when he fired the shot that killed deceased. That he thought deceased struck Paden on the right side of the head. That none of them went back to the place where Sword was after the shooting. That Sword had something in his hand, but he did not know what it was.

Tom Miller, who said he was 13 years old, testified almost *verbatim* to the facts detailed by Jim Miller.

Van Paden, in his own behalf, testified: That the boys of the deceased came to him and asked to cut wood, and he let them have the job. That, after they had completed the job, he looked it over, and the wood was cut and ricked up in such a manner that he could not use it. That he finally told them he would pay them for it as soon as he could sell some cotton. That he brought in his cotton the day before the killing and had it under the shed that night, but had not sold it. That he was going to town with the Miller boys, and he met the deceased' and did not recognize him until after they had passed each other. That, when they got about five steps apart, deceased called to him, and he walked back, and deceased came on, meeting him. That deceased had a bundle of something in his right hand. That deceased asked him

if he did not think it was about time to pay the kids for the wood. That he replied that he had told them the night before that he was going to pay them as soon as he sold his cotton. That the deceased then asked, "When in the hell are you going to do it?" That he said when he sold his cotton, and then deceased demanded, when in the hell would that be, and he said when he got ready.—"Sword then struck me with his left hand on the shoulder, and I fell east."—That as he was getting up, he saw Sword coming at him again, and he began to shoot. That he had his pistol in his overcoat pocket; that he shot twice, as fast as he could. That after it was over, he walked back and got his hat and went away, walking fast up the road. That at the time of the shooting, he knew of other trouble and difficulties Sword had had. That he had trouble with one man named Whitaker, and with Roland Ross, and with Earnest Ferrell.—Had seen Ferrell the next day after the difficulty. His hand was bound up. He said his leg was hurt and he was limping, and he was in a pretty critical condition; his face was skinned in a very ugly manner, and he had his hand in a sling; heard Ferrell talk about it the next day. Deceased said that if the Ross boy had not knocked him off he would have killed Ferrell, and he said if ever he got to the Ross boy he would "stomp the liver" out of him. He said he would "show these people around here some things." Ferrell was about 21 years old, and the Ross boy was about 18.—That he regarded deceased as a turbulent man, and shot him because he knew he was in the habit of knocking people down. That deceased was a large man, and he knew that he would have had no show in a fight with deceased, and that his only recourse was foul means. That he shot deceased because he thought deceased was coming on him with his feet.

That he had a gun belonging to Wat Duncan. That he had borrowed it to serve as a special officer in August. That he had a special deputyship for one day. That Duncan had asked him for the pistol two or three times. That he had heard several people, among them Fulton Goodrich and John Carlisle, say that Sword was a dangerous man. That there was snow on the ground that night. That he was cool and collected in the difficulty and never saw a man that he was afraid of. That he fired with his left hand, and then walked back to get his hat. That when he fired he was about three feet from deceased on his hands and knees. That deceased's boy was standing by him when his father struck the blow prior to the shots being fired. That he next saw the boy going around towards Johnson's store. That deceased had had some trouble with John Whitaker over wood the boys had cut for him. That he was not in the least mad when he met Sword. That J. S. Smith's house was about 30 steps from where the shooting occurred. That the deceased was six feet tall and weighed 200 pounds, and that he weighed 135 pounds.

John Collins, for the defense, testified: That he heard deceased talk the day after he had the trouble with Red Ferrell, and that he was also mad at the Ross boy for hitting him with a rock the night before, and said he was going to "stomp the guts" out of these boys, and that he just wanted to "learn the boys in this country something." That he heard the deceased say that the defendant had not paid his children for the wood they had cut for him; that it was about time he was doing it; that he was going to whip the water out of him if he did not do it right away. That he was living on Mr. Paden's place. That their last conversation was in December. That he

saw the difficulty between the deceased and the Ferrell boy, and was present when John Whitaker came along. Deceased had a reputation as being a dangerous man. That he was at Sword's house when his son Claud came in and said they were fighting down there, and—"I told Sword to go down there, and I went with him, about 100 yards from his house, and he knocked the Ferrell boy down and stomped him. The Ross boy is the son of Mrs. Ross, who has testified. He made the statement to me that he had heard Bob Looney say that the deceased was a bad man."

Earnest Ferrell said that he saw Van Paden the day after he had the difficulty, but did not show Paden his hand or leg.

Roland Ross said that he saw the difficulty between Sword and Ferrell, and that he knocked Sword off of him.

W. E. Duncan testified that Sword's character was bad; that he was regarded as a dangerous man; that he, Duncan, had loaned Paden a pistol to arrest a man as an officer; that he had asked him for it several different times, and had not gotten it; that he is a distant relative and friend of Paden's.

Will Ivans, Lester Lissen, and R. W. King testified that Sword was a dangerous man.

Ira Treet, in rebuttal, on behalf of the state, testified that he knew deceased; that his character as a law-abiding citizen was good.

Witness G. W. Johnson testified that the deceased just slapped the Ferrell boy, and that the boy was out the next day playing baseball; that Whitaker had accused deceased of stealing coal, and he was about to slap Whitaker's jaws; that he never heard of him having any diffi-

culty with anybody else; that Whitaker talked to him about his trouble himself; that he ran a pool hall.

George Coke, Mark Wain, and J. R. Jones, and T. F. Latta, postmaster, and Price Matthis, merchant, all testified that the deceased's character as a law-abiding citizen was good. There are only two errors of consequence insisted upon.

The first is that the court erred in admitting the dying declaration of the deceased. This contention is based upon the proposition that proof on behalf of the state fails to disclose the fact that the deceased realized that death was impending at the time the statement was made. This question has been decided contrary to the plaintiff in error's contention. In the case of *Morris v. State,* 6 Okla. Cr. 29, 115 Pac. 1030, we said:

"It is essential to the admissibility of dying declarations, and is a preliminary fact to be proved by the prosecution, that they were made under a sense of impending death. This may be made to appear from what the injured person said, or where, from the nature and extent of his injuries it is evident that he must have known that he could not survive. It is sufficient if it satisfactorily appears that they were made under the sense of impending death, whether it be directly proven by the express language of the declarant, or be inferred from his evident danger, or the opinions of the medical attendants, stated to him, or from other circumstances of the cases, such as the length of time elapsing between the making of the declaration and his death, and the fact that the declarant was so weak that he could not sign his name and so affixed his mark, all of which are resorted to, in order to ascertain the state of declarant's mind."

The facts in the case under consideration show clearly that deceased realized that death was near; he so

stated when he was first approached, and immediately
thereafter he fainted, revived after a hard struggle, and
was carried home. It is clearly apparent that while suf-
fering great pain deceased made the statement from time
to time as his condition would permit, until it was con-
cluded. There is no doubt that the dying declaration was
made at a time when the deceased realized that death
was near, and was entitled to be admitted in evidence.
See *Addington v. State,* 8 Okla. Cr. 712, 130 Pac. 311;
*Mulkey v. State,* 5 Okla. Cr. 78, 113 Pac. 532. In the
Mulkey Case the deceased said, "Oh, my God! I am
killed." The court held that the dying declaration was
properly admitted. See, also, *Nelson v. State,* 3 Okla.
Cr. 473, 106 Pac. 647; *Hawkins v. U. S.,* 3 Okla. Cr. 656,
108 Pac. 561; *Blair v. State,* 4 Okla. Cr. 365, 111 Pac.
1003; *Smith v. State,* 5 Okla. Cr. 289, 114 Pac. 350; *Offitt
v. State,* 5 Okla. Cr. 55, 113 Pac. 554.

The next assignment of error is based upon the
proposition that the court's instruction on self-defense
was erroneous. That instruction is as follows:

"You are further instructed, as a matter of law, that
the bare fear of an assault upon the defendant by the de-
ceased would not justify the defendant in killing the de-
ceased; nor will the mere fear of the defendant that the
deceased was about to commit an assault upon him (the
defendant) amounting to a felony justify the defendant
in killing the deceased unless the defendant, as a reason-
able man, believed from all the circumstances as they ap-
peared to him at the time, that he was in imminent dan-
ger of an assault being made upon him by the deceased,
and from which apprehended assault he had reasonable
cause to believe, and he did honestly believe, that he
would lose his life thereby or suffer great bodily harm
from such apprehended assault, as viewed from the stand-
point of the defendant as a reasonable man. If you be-

lieve and find from the evidence that the defendant committed the homicide through mere fear of an assault from the deceased, and such fear was not founded upon reasonable apprehension of danger, from all the circusmtances in the case, then, and in that event, the plea of self-defense will not avail, and you should find the defendant guilty, under the instructions herein given."

There was no exception saved to this instruction. The principal argument against the same is based upon the proposition that the instruction required the defendant, as a reasonable man, to believe from all the circumstances as they appeared to him, at the time, etc., before he would be entitled to act. The burden of complaint is against requiring the jury to find the defendant, as a reasonable man, to believe, etc. Under the facts and circumstances discussed by the record in this case, there is absolutely no prejudice in this provision in the instruction. The defense was not that of lunacy, intoxication, or incapacity. The plaintiff in error testified that he was cool and collected during the fatal difficulty and never saw a man in his life that he was afraid of. Upon his own statement of the circumstances and of the immediate facts, he is guilty of manslaughter in the first degree and he offered no defense whatever to a charge of that character.

Other errors assigned and argued in the brief are based upon theoretical propositions pertaining to the law of murder. The jury convicted of manslaughter in the first degree, and only errors which are calculated to affect the substantial rights of the plaintiff in error in connection with the crime of which he was convicted will be considered. As an abstract proposition, some of the criticisms of the instruction under certain circumstances would be entitled to consideration if the conviction had been for murder instead of manslaughter.

Finding no substantial error in the record, the judgment of the trial court is affirmed.

DOYLE, P. J., and MATSON, J., concur.