## ISRAEL WILLIAMS v. STATE.

No. A-3336—Opinion Filed April 15, 1920.

(188 Pac. 890.)

(Syllabus.)

1. **CONTINUANCE—Absent Witnesses—Diligence.** In an application for a continuance on the ground of the absence of a witness for the defendant, the application must set out fully the facts constituting the diligence to procure the attendance of said witness, or to take his deposition prior to the commencement of the trial.

2. **SAME—Denial of Continuance—Discretion of Court.** Where an application for a continuance fails to set out any facts disclosing diligence on the part of the defendant to procure the absent witness, or to take his deposition prior to the commencement of the trial, and there is no showing that the whereabouts of the witness are known to the defendant, or that there is any likelihood of procuring his attendance or taking his deposition before the next term of court, and where the evidence sought to be elicited from such absent witness would only be cumulative, there is no abuse of discretion in denying the continuance.

3. **HOMICIDE—Dying Declarations—Admissibility.** Declarations concerning the facts surrounding the commission of the alleged homicide, made by the party injured under a sense of impending death, are admissible as dying declarations.

4. **TRIAL—Instructions—Refusal of Requests.** It is not error to refuse to give instructions requested by the defendant, where there is no evidence to support the same.

*Appeal from District Court, Choctaw County;*
*C. E. Dudley, Judge.*

Israel Williams was convicted of the crime of manslaughter in the first degree, and he appeals. Judgment affirmed.

Israel Williams was convicted in the district court of Choctaw county, at the October term, 1917, for the crime

of manslaughter in the first degree, alleged to have been committed by him on the 11th day of July, 1917, by shooting and killing one Joe Childers with a pistol. Defendant was sentenced to serve a term of 10 years' imprisonment in the penitentiary. The shooting occurred on the premises of the defendant in Choctaw county about 3 o'clock in the afternoon of the 11th day of July, 1917, the deceased dying about 9 o'clock the next morning.

The deceased was a tenant on the farm of the defendant, and lived about a quarter of a mile distant from the house of the defendant. Deceased was a married man, with some children, and had been working for the defendant off and on for over 2 years.

On the day of the killing, the defendant was over at the home of the deceased, and took about a pint of whisky with him, and the defendant, deceased, and one other drank from this bottle of whisky early in the morning of that day. The defendant was somewhat intoxicated, and later came to the home of the deceased to borrow a horse to go and get some more whisky. After borrowing the horse, the defendant again returned to the home of the deceased, and had dinner, and after dinner the defendant and deceased went over to defendant's house, and it was while they were over there by themselves that the tragedy occurred.

The deceased stated after he was shot that Israel Williams had shot him, and he (deceased) believed defendant had killed him; that he had no idea that Israel would ever have done it, or he never would have gone home with him; also that it looked hard for an honest man to have to die that way; that he hated to leave the children for his wife to do the best she could with them. He stated further that

after they had got over to Israel's house, Israel told him to pick the banjo for him so he could dance, and deceased said he was picking the banjo and Israel was dancing, when deceased stopped, and Israel went in the house and came back with a gun and said he was going to kill deceased and Lee Novels both; that they had run over him enough. Deceased said that he asked defendant not to shoot him, but that Israel commenced to fire, and fired three shots, and the fourth shot hit him, and deceased said that he started home, and Israel then said he was going to follow him and kill him; that when he started home, he left Israel reloading his gun.

The wife of the deceased testified that she heard the shots and heard her husband hollowing, and that she went immediately in the direction of Williams' house, and found her husband by the side of the road, badly shot, and Israel Williams about 18 steps away with a pistol in his hand, and that she heard the defendant say at that time to her husband: "Good-bye, you ————————; I'll kill you yet;" that thereupon she assisted her husband home; that her husband was suffering intense pain and died about 9 o'clock the next morning.

The defendant testified concerning the homicide as follows:

"Q. Did you come back to Joe's house then after you rode the horse awhile? A. Yes, sir.

"Q. Did you have dinner over there? A. I don't recollect eating dinner there, but they say I eat dinner there.

"Q. Then where did you go? A. I went home.

"Q. Who went with you? A. Joe.

"Q. Now what took place after you got over there? A. Well, I went and got a banjo. I come out on the gallery,

and he went to picking the banjo, and he wanted me to dance, and I told him I couldn't dance, and he kept on after me, and I made on like I was dancing. After I got tired I just sat down on the gallery, and after awhile he quit picking. I had a string on the banjo, and he wanted to borrow some money from me, and I told him I didn't have any, and he says, 'I know damn well you have got it,' and I says, 'No; I ain't got no money.' 'Well,' he says, 'I am going to have it anyway,' and he commenced cussing me, and I just got up—

"Q. What did he call you when he was cussing you? what did he call you?    A. He called me a son of a bitch.

"Q. And what did you do then?    A. I just got up, and started out towards the fence, and he come up behind me and gave me a push and struck me in the boot here (indicating)—that's the foot—and I fell down, and I got up. Then he struck at me with the banjo, and I just got up and went around the house, and he followed me. I come to the back door and went in the house; I just went on in and got my gun and walked out, and he come through the house following me.

"Q. Where was the gun?    A. It was on the bed under a pillow.

"Q. What took place out at the gallery?    A. I just shot towards him. I didn't aim to hit him.

"Q. Before the shooting took place, what did you tell him about trouble, if anything?    A. I just told him that I didn't want to have any trouble with him, and I didn't want him to hurt me, and I didn't want to hurt him.

"Q. Then did he hit you first, or did you shoot first? A. He hit me first.

"Q. What did he hit you with?    A. A banjo.

"Q. Where did he hit you?    A. Right up here (indicating), and right down there (indicating).

"Q. Do you know how many shots you fired? A. No, sir.

"Q. Do you remember what took place after you was hit? A. No sir; I don't know anything about—

"Q. Tell that jury whether or not you thought you was in any danger when you went to shooting? A. Well, I thought I was in danger. The banjo is brass, and weighs about five or six pounds.

"Q. And did you shoot because he hit you? A. Yes, sir.

"Q. What was Joe Childers doing at the time you shot, if you know? A. No, sir; I don't.

"Q. You don't remember anything after he hit you? A. No sir. * * *

"Q. Did you have any ill feelings towards Joe that morning when you went over to Joe's house; was you mad at him? A. No, sir.

"Q. Did you tell Joe that you was going to kill him and Lee Novels? A. I don't know, sir.

"Q. You don't remember telling him anything of the kind? A. No, sir; if I did, I was just saying that, I guess. We had been talking about one another there all the time.

"Q. About getting one another, but if you did tell him that, you didn't mean it, did you? A. No, sir.

"Q. Was you mad at Joe when you and him went back over to your house and Joe went to picking the banjo? A. No, sir; I wasn't.

"Q. And if you shot Joe and killed him that evening, you did it because you thought he was trying to kill you with that banjo? A. Yes, sir."

On cross-examination the defendant testified in part as follows:

"Q. Israel, you say you was drinking some that day you shot Joe? A. Yes, sir.

"Q. How much had you drank? A. I don't know. I don't know how much I did drink.

"Q. How much did you drink the day before? A. I was already full that morning. I don't know how much I did drink.

"Q. What time of the day was it when you went over to Joe's the first time? A. First time about 8 or 9 o'clock.

"Q. You say you took a drink or two that time over there? A. Yes.

"Q. How many drinks did Joe take? A. Why, he taken about four.

"Q. And you taken about how many? A. I take one —two.

"Q. Two? A. Yes. * * *

"Q. Didn't you eat dinner at Joe's that day, that evening some time? A. I might eat dinner there, but I don't know it.

"Q. Don't remember it, do you? A. No, sir.

"Q. In fact, you don't remember many things down there, that day, do you? A. Not many.

"Q. Where was Joe sitting when he was picking that banjo; whereabouts was he sitting? A. On the gallery.

"Q. Whereabouts on the gallery? A. On the right-hand side of the door.

"Q. Leaning back against a post, was he? A. No, sir; leaning against the wall.

"Q. Leaning against the wall facing out in the yard? A. Yes, sir.

"Q. How long did Joe play that banjo before you went out in the yard? A. He didn't play it long. I guess it was about a quarter of an hour.

"Q. When was it he asked you for some money that day? A. That day?

"Q. Yes. A. He asked me—he wanted to borrow it right after he got through picking the banjo and dancing.

"Q. Where was you when he asked you for the money? A. I was sitting on a chair in the yard.

"Q. What did you do then? A. I didn't do anything. I just told him I didn't have the money.

"Q. When did you go out to the gate? A. Well, when he wanted to borrow the money I told him I didn't have it, and he says he knows damn well I did have it; he says, 'I am going to have it anyway,' and when he said that I just got up and started towards the fence, and he come up behind me and give me a push, and he struck me on the foot there—this foot (indicating).

"Q. Then what did you do? A. Fell down.

"Q. You was pretty drunk, wasn't you? A. I guess I was.

"Q. How long did you lay on the ground before you got up? A. I just got right up and went around the house and he followed me.

"Q. What did you say Joe called you? A. He called me a son of a bitch.

"Q. I believe you stated a while ago that you didn't think much about that; that was a common byword between you, wasn't it? You just called each other sons of bitches any time you thought about it, didn't you? A. When we got to drinking.

"Q. And when you wasn't drinking you still kept it up, didn't you? A. I guess so.

"Q. You went around to the back of the house? A. Yes, sir.

"Q. Went around the back way? A. Yes, sir.

"Q. Went into your bed and got the gun and went out the front door, and at that time Joe had come up and was standing on the front gallery? A. No, sir; he followed me.

"Q. Where was you when you done the shooting? A. Out on the ground.

"Q. Then you went out in the front yard? A. I got off of the gallery and then he got off, and I come back to the gallery, and he still followed me, and I shot. I wasn't aiming to hit him.

"Q. And Joe hadn't touched you since the time you fell down, had he? A. He touched me with the banjo.

"Q. Where? A. (Indicating).

"Q. I know, but whereabouts was he touching you with the banjo? A. Out in the yard.

"Q. Was that just before he shoved you down? A. That was after.

"Q. Did he hit you one or two licks? A. One; come down this way (indicating).

"Q. And then you went around behind the house, went in and got your gun, came on back and went out in the yard, didn't you? A. Yes, sir.

"Q. Then you came back on the gallery, and then was when you done the shooting, wasn't it? A. Yes, sir.

"Q. Where did you go then? A. I just set down on the gallery.

"Q. Where did Joe go? A. He went home.

"Q. Didn't you follow him? A. I don't recollect following him."

The foregoing statement of the case is sufficiently comprehensive for the purposes of this opinion.

*Warren & Warren* and *Cunningham & Hunter*, for plaintiff in error.

*S. P. Freeling*, Atty. Gen., and *W. C. Hall*, Asst. Atty. Gen., for the State.

MATSON, J. (after stating the facts as above). It is first contended that the trial court erred in overruling defendant's motion for a continuance on account of the absence of Dr. H. W. Mier, who it is alleged would testify, were he present, that on the next day after the alleged killing the witness examined the defendant and found him suffering from a blow on the left side of his head, which rendered defendant incapable of knowing or understanding what he was doing; also, that he knows of no other competent person who will testify to such facts. It is also alleged that the said witness is out of the state and beyond the jurisdiction of the court, and that the defendant will take the witness' deposition, and asks that the cause be continued until the next regular term of the court for that purpose.

The court very properly overruled the motion: (1) Because there is no showing of any facts disclosing any diligence on the part of the defendant to procure the attendance of this witness, or to take his deposition prior to the commencement of the trial; (2) because there is no showing that the whereabouts of the witness are known to

the affiant (defendant), or that there is any likelihood of taking his deposition or procuring his attendance should the cause be continued until the next regular term of court; (3) because the material facts stated in said application were testified to by other witnesses during the trial, and the competent evidence would only be cumulative. For all of which reasons, no manifest abuse of discretion on the part of the trial court in overruling the motion appears from the record.

It is next contended that the trial court erred in permitting the witness Mrs. Childers to testify, over the objection of the defendant, to the statements made by the deceased concerning the facts and occurrences at the time of the commission of the alleged homicide. The court admitted this evidence as a dying declaration on the part of the deceased.

We have carefully examined the record, and this court is of the opinion that the record discloses a sufficient showing that at the time the deceased made said declarations he realized that death was impending, and was at that time without hope of recovery. Under such circumstances the declaration was properly admitted. *Paden v. State,* 13 Okla. Cr. 585, 165 Pac. 1155; *Addington v. State,* 8 Okla. Cr. 712, 130 Pac. 311; *Mulkey v. State,* 5 Okla. Cr. 78, 113 Pac. 532; *Blair v. State,* 4 Okla. Cr. 365, 111 Pac. 1003.

Lastly it is contended that the court erred in refusing to give instructions Nos. 1 and 2, requested by the defendant. Said instructions read as follows:

"I charge you that if you believe from the evidence or have a reasonable doubt thereof, that the deceased assaulted the defendant unlawfully, with some heavy instrument and struck him on the head or face, and by said stroke rendered him unconscious at the time and during this period of unconsciousness defendant shot and killed the deceased, and at the time he fired said shot defendant was in such a state of mind that he did not know what he was doing, or know the consequences of his act, then you will acquit the defendant.

"I charge you if from the evidence you believe, or have a reasonable doubt thereof, that the deceased assaulted the defendant unlawfully with some heavy instrument and struck him on the head or face, and by said stroke that the defendant was bereft of his reason, he shot and killed the deceased, and that at the time he fired said shot the defendant was in such a state of mind that he did not know what he was doing, or know the consequences of his act, then you will acquit the defendant."

These instructions were properly refused. There is not any evidence in the record which would support the theory that defendant was unconscious at the time of the commission of this homicide, neither is there any evidence whatever that defendant was temporarily insane. The excerpts taken from the defendant's testimony above copied in the statement of the case show that if the defendant had any defense whatever for taking the life of the deceased, it was based solely on the ground of self-defense, and the court gave the defendant the benefit of this defense in the instructions given. This court has repeatedly held that the trial court is not required to instruct upon any theory of defense unless there is some evidence to support the same. *Newby v. State,* 17 Okla. Cr. ——, 188 Pac. 124, and cases cited therein.

Finding no evidence in the record in this case which would authorize the court to give the instructions requested, it was clearly not error to refuse the same. In fact, the evidence that the defendant killed the deceased in self-defense is very meager, and the trial court's action in giving the benefit of that defense to the defendant was favorable to him.

This record discloses a homicide committed by the defendant when he was evidently greatly intoxicated, perhaps to such an extent that he was incapable at the time of forming any premeditated design to take life, and for that reason the jury found him guilty of manslaughter in the first degree. The verdict was a humane and merciful one, and fully warranted by the evidence.

Finding no error in the record prejudicial to the substantial rights of the defendant, the judgment is affirmed.

DOYLE, P. J., and ARMSTRONG, J., concur.