## HARRY LA COSS v. STATE.

No. A-4170.   Opinion Filed Oct. 27, 1923.
(219 Pac. 416.)

(Syllabus.)

1.   **Appeal and Error—Continuance Within Court's Discretion.** Applications for a continuance are addressed to the discretion of the trial court and a judgment of conviction will not be reversed because of the refusal of the trial court to grant a continuance, unless a manifest abuse of discretion appears.

2.   **Continuance—Continuance for Merely Cumulative Evidence Denied.** Where a continuance is asked to permit defendant to obtain evidence of witnesses residing without the state, and it is not made to appear from the face of the motion that such evidence will be material, and further it appears from the motion that, if material, it will be cumulative of other

evidence available to applicant, the continuance is properly denied.

3. **Trial—Assistance of Private Counsel in Prosecution—Authority for Appearance.** The assistance of private counsel in the trial of criminal cases is not prohibited. Where county attorney instituted the prosecution and appeared in and conducted the trial, it is discretionary with the trial court to require private counsel to state to the court (for the benefit of the defendant) by what authority he appears to assist in the trial.

4. **Same—Failure to Require Private Counsel to State not Reversible Error.** Where the prosecution appears from its inception to have been instituted and carried on in the name of the state, and it is not made to appear that private counsel was guilty of any misconduct prejudicial to the substantial rights of the defendant at the trial, the mere failure of the trial court to require private counsel to state by what authority he appears to assist in the trial will not be held reversible error.

5. **Trial—Homicide—Instructions to be Applicable to Evidence—Failure to Instruct on Second Degree Manslaughter not Erroneous.** The instructions should be applicable to the evidence. In a prosecution for murder the failure of the trial court to instruct on manslaughter in the second degree is not erroneous; there being no testimony tending to reduce the homicide to that of manslaughter in the second degree.

6. **Witnesses—Impeachment by Showing Statements Contradictory to Testimony—Laying Predicate.** A witness may be impeached by showing that he has made, out of court, statements material to the issues, contradictory of his testimony at the trial. Where the attention of the witness is first called to the time, place, and persons involved in the supposed contradictory statements in a manner sufficiently definite to reasonably refresh his recollection, and to call his attention to the substance of the subject-matter and statements upon which it is intended to impeach him, the predicate is sufficient.

7. **Instructions Approved.** The instructions as a whole held to fairly and fully cover the law of the case, and to be not misleading or contradictory.

Appeal from District Court, Stephens County; A. S. Wells, Special Judge.

Harry La Coss was convicted of manslaughter in the first degree, and he appeals. Affirmed.

Appeal from the district court of Stephens county. Con-viction of manslaughter in first degree with punishment at 30 years' imprisonment in the penitentiary. Judgment render-ed July 21, 1921. Petition in error and case-made filed in this court January 16, 1922. Prosecution for murder alleg-ed to have been committed on the 5th day of June, 1921, by defendant stabbing and cutting one Jim Vance with a knife. A synopsis of the substantial testimony of the witnesses fol-lows:

"J. P. Briggs testified that he was the proprietor of the 'B & V Cafe' in Empire City, where the fatal difficulty oc-curred; that, at the time of the fatal difficulty, the defendant was working for the witness as a cook; that he was attract-ed to the difficulty by two men falling on the floor of the kitchen, and that he arrived on the scene immediately af-ter and found the defendant and the deceased lying side by side; that the deceased had his right arm around the defen-dant's neck and that their faces were close to the floor; that the defendant held a knife in his right hand and the point thereof was sticking in the floor; that the deceased was stabbed in the left side of the neck and lived about three minutes after the witness got to him.

"Louis Bledsoe testified in substance that he was en-gaged in the pool hall business; that he was about two doors from the 'B & V Cafe' when he heard the noise of the dif-ficulty between the deceased and the defendant; that when he arrived the deceased was lying on the floor and a bloody knife was lying on a table in the kitchen; that the deceased died soon after.

"L. Woodward testified that he was engaged in the un-dertaking business af Duncan, Okla., and prepared the de-ceased Jim Vance for burial, and described the wounds on the body of the deceased as a stab on the left side of the neck and a gash in the muscle of his left arm, the stab sev-ering part of the jugular vein.

"Sam Harlan testified that he knew the deceased for

about two weeks before his death; that at the time of the difficulty he was working as a dishwasher at the 'B & V Cafe,' assisting the defendant, but that he had only known the defendant about two hours before the difficulty; that immediately before the difficulty, the deceased came into the back door of the kitchen; and that the deceased spoke to the witness, but did not speak to the defendant when he came into the kitchen; that the defendant asked the deceased why he kicked his boy, and after a heated conversation between the defendant and the deceased, the witness left the kitchen by the back door and did not see any of the difficulty. The witness further testified that he had been in jail since the time of the difficulty, being held as a witness for the state. The witness denied that in the presence of John Schulz, Mrs. Schulz, Mrs. Matthews, and Mr. Hood, or either of them, while he was in jail, he had a conversation in which he inquired if the defendant had any money, and stated that he had never told all that he knew about the killing, and could clear defendant for $300 or $100.

"V. Dombroske testified as follows: That at the time of the difficulty the witness was lying on a cot in the building adjoining that in which the trouble occurred, and upon hearing the noise ran to the back door of the kitchen where the difficulty was, and saw the defendant and the deceased lying on the floor, the defendant holding a knife in his hand and the deceased trying to get up; that the witness immediately left to get some weapon to knock the knife out of the defendant's hand.

"Ed Skeen testified that at the time of the difficulty he was working as a dishwasher in the place of the deceased in a restaurant adjoining the restaurant where the difficulty occurred; that he was attracted to the 'B & V Cafe' by the noise of the difficulty between the defendant and the deceased, and went immediately to the back door of the 'B & V Cafe,' and there he saw the defendant standing over the deceased; that no other person was present at the time except the witness Briggs, the defendant and Jim Vance; that the defendant had a knife in his hand at the time, and the deceased was lying on the floor.

"Walter Vance testified that he was the father of the deceased; that the deceased was 18 years of age at the time of his death.

"John Schulz testified for defendant that he knew the witness Sam Harlan, and had a conversation with Harlan relative to what his testimony would be in this case, and that Harlan stated in substance that if they would dig him up $300 or $100, one or the other, that he knew some things connected with this case that would clear old man La Coss, and that he would tell it if they would furnish that much money; that he was in the thing for as much money as he could get out of it.

"Mrs. Kate Matthews testified in substance as the witness John Schulz relative to the statements made by the witness, Sam Harlan.

"John Hood testified substantially as the witness John Schulz and Mrs. Matthews.

"Harold La Coss testified that he is a son of the defendant; that he was near the 'B & V Cafe' at the time the fatal trouble arose; that upon hearing the noise he went immediately to the place of the difficulty, and that the defendant, Jim Vance, and the witness Briggs were present at the time; that the deceased and the defendant were lying on the floor, with one arm about each other's necks; that when he arrived the defendant had the knife in his hand and the point of the knife was sticking in the floor; that the witness picked up the knife, and placed it on the table in the kitchen.

"Henry La Coss testified that he is a son of the defendant; that he is thirteen years of age; that a short time before the fatal difficulty he was kicked by the deceased near the restaurant; that something was said about the witness telling his father about being kicked by the deceased, and that the deceased called his father a low-down son of a bitch and a bastard, and that if the witness told his father he would kill that low-down son of a bitch if he came out there; that the witness went immediately to his father, and told him what Jim Vance had done and said, and that his

father had told him to go on home and let everything drop.

"Dewey Gowan testified that he was with the witness Henry La Coss at the time of the threats made by the deceased against the defendant, and his testimony is substantially the same as that of Henry La Coss.

"Willie Walton testified that he was with the witness Henry La Coss and the witness Dewey Gowan at the time of the difficulty between the witness Henry La Coss and the deceased, his testimony being substantially that of Henry La Coss and Dewey Gowan.

"S. S. Baker testified that he had known the defendant since November, 1918, that he was acquainted with the general character of the defendant at the different places he had known him; that his reputation for being a peaceable and law-abiding citizen was good.

"E. B. Wilkinson testified substantially as the witness S. S. Baker as to the reputation of the defendant.

"Mrs. Harry La Coss testified that she was the wife of the defendant; that she and the defendant have been married about 21 years; that she has four children living; that the defendant, prior to coming to Oklahoma, worked as an oil well driller and as a railroad man, but that on coming to Empire City, Oklahoma, he was compelled to work as a dishwasher and cook; that they lived in a tent at Empire City; that her husband has always been a peaceful and law-abiding citizen, and had never had any trouble; that the defendant had had two sunstrokes, and frequently suffered great pains in his head on account of the heat; that she knew the defendant's father, and that his father died insane in the state of Missouri; that his father became insane at approximately the same age that the defendant is at this time.

"Harry La Coss testified that he is 51 years of age; that a short time before the fatal difficulty arose, his little boy, Henry La Coss, came to him while he was working in the kitchen of the 'B & V Cafe,' and told him that 'Big Boy,' meaning the deceased, had kicked him, and that the boy told him that the deceased had called him an old bas-

tard; that shortly before the difficulty, the witness Sam Harlan, who was working in the kitchen at the time, went out at the front of the restaurant several times; that soon thereafter the deceased, Jim Vance, came in at the back door of the restaurant, and the defendant asked him what the trouble was between him and his small boy, Henry La Coss; the witness told the deceased to go out of the restaurant, that he did not want to fuss with him; that the deceased struck the defendant on the neck; that when the deceased struck the defendant the deceased said, 'Do you like that, you old son of a bitch,' and at the same time grabbed for the knife lying on the table; that the deceased and the defendant both reached for the knife at the same time; that when the deceased struck him on the neck he was thrown back and when the deceased reached for the knife the defendant managed to get it first; that the deceased then made a rush for the defendant's throat, and that the defendant was in such a state of mind that he does not recall what occurred thereafter, until he was spoken to by the witness Briggs, while the defendant and the deceased were lying on the floor; that immediately after the difficulty he came to Duncan and gave himself up to the sheriff; that he has no recollection of stabbing or cutting the deceased, but that he assumes that the deceased was cut, by the blood on his own clothing; that the kitchen in which the defendant worked at the time had a low roof, and that a hot stove was going, and that the temperature was very hot and sultry; that the defendant was subject to sunstroke; that heat frequently causes him to become groggy, and he is unable to see anything; that when he has these spells and pains in the head, he is unable to recollect and forgets himself; that his father died in an insane asylum at St. Joseph, Mo., that he became insane at about 53 years of age. Defendant also testified that he did not remember having any conversation with Jim Brown or Mrs. Brown or with the sheriff in the courthouse in the city of Duncan shortly after the killing, defendant also denied conversation with R. G. Crossland on way to Duncan immediately after killing.

"J. B. Bartley testified that he is a practicing physician, and has been in the practice for approximately 25 years;

that during said time he has had occasion to treat and observe patients suffering from sunstroke and insanity. A hypothetical question was asked the witness which in substance was: 'Assuming the theory of the defendant that the defendant was struck a violent blow at the base of the brain, and that the defendant was subject to sunstroke and the loss of consciousness on account of heat, and that his father, at approximately his own age, had become insane, if such matters might deprive such person of his reason, temporarily or deprive such person of his reason permanently and render him incapable of knowing his acts and the wrongfulness of his acts?' The witness answered the question that it might do so.

"Lee Curtis testified that he was in jail at the time the defendant was brought to the jail; that the defendant was suffering about the head and neck at the time, and that the witness treated him for the trouble by placing wet towels on his head and neck.

"Frank Wright testified substantially as did the witness Lee Curtis.

"In rebuttal the state called as a witness Mrs. Jim Brown who testified that she was a deputy sheriff and jailer at the time the defendant was brought to the jail of Stephens county; that she had a conversation with the defendant in the jail when herself and her husband were present, part of her testimony being as follows:

" 'Q. Mrs. Brown, I will ask you if he stated to you on that occasion, this or this, in substance, that the fellow who had kicked his boy came into the restaurant, and he asked him why he kicked the boy, and he said he throwed dirt on his shirt, and he told him to get out of the restaurant and he didn't go, and Vance struck at him and he knocked the lick off with his left hand, and grabbed the knife with his right hand. I will ask you if he didn't tell that in substance.

" 'By Mr. Merrill: Objected to as incompetent, irrelevant, and immaterial; no predicate being laid. Don't know the time and place, and it is different from the question ask-

ed the defendant as to the time and place; it might refer to the witness Mr. Brown. The witness on the stand testified the conversation was upstairs, and the conversation with the witness Brown whose predicate was made or referred to downstairs, and the further objection as it is not in the language of the county attorney as submitted to the defendant on the stand yesterday and for the further reason that the answer of the defendant yesterday is such an answer as to prevent the impeachment, being of such a nature as to not permit an impeachment.

" 'By the Court: Overruled.

" 'By Mr. Merrill: To which the defendant excepts.

" 'Q. Did he tell you that or that in substance? A. He told me that in part, not all of that language.

" 'By Mr. Merrill: I ask that answer be stricken out, and the jury instructed not to regard it.

" 'By the Court: Overruled.

" 'By Mr. Merrill: To which the defendant excepts.

"Jim Brown testified that he is a deputy sheriff of Stephens county; that he knew the defendant, Harry La Coss; that after the defendant surrendered himself he had a conversation with the defendant, part of his testimony being as follows:

" 'Q. I will ask you if he didn't tell you this or this in substance, that the deceased, Jim Vance, came into the "B & V Cafe" where he was cooking, and prior thereto, about 20 or 30 minutes, he kicked his boy, and he asked Jim Vance why he called him a bastard, to which Jim Vance replied he was a little too fast, and that Jim Vance struck him with his fist, and the defendant knocked off his lick with his left hand, and picked up the knife with his right hand?

" 'By Mr. Merrill: Objected to for the reason of the time and place and circumstances that same was made and that same was made under duress of imprisonment and without warning on behalf of the officers that such statements

could be used against him if made there.

"'By the Court: Overruled.

"'By Mr. Merrill: To which defendant, excepts. And we object for the further reason that the answers made by the defendant on the stand yesterday will not justify impeaching questions, for the reason that same was not an unqualified denial.

"'By the Court: Overruled.

"'By Mr. Merrill: To which defendant excepts. A. Yes, sir.'

"'R. G. Crossland testified in part as follows:

"'Q. Do you remember of seeing the defendant after the killing the same day? A. Yes, sir. Q. Where did you see him? A. I was coming to town and overtaken him out here the other side of the cemetery. Q. Did you ride any part of the way with him? A. Yes, sir; he asked to ride to town, something was wrong with his car. Q. Did you hear him make any statements about the killing of Jim Vance? A. Yes, sir. Q. I will ask you if he made this statement or this in substance, that he had cut a son of a bitch's throat in Empire City who had kicked his little boy, and he could stand a little himself, but wouldn't stand for anybody to fool with his children, that he started to throw the son of a bitch out of the building, and he struck at him, and he cut his throat?

"'By Mr. Merrill: Objected to as no predicate has been laid in the cross-examination of the defendant, and for the reason the question doesn't state the time and place and the question is in words and language and import an intention of that sort to have the defendant admit and that when the question was submitted to him wholly improper and is at this time.

"'By the Court: Overruled.

"'By Mr. Merrill: To which the defendant excepts. A. He did.'"

J. G. Clift, for plaintiff in error.

George F. Short, Atty. Gen., and Kathryn Van Leuven, Asst. Atty. Gen., for the State.

MATSON, P. J. (after stating the facts as above). It is first contended that the trial court erred in overruling the motion for continuance.

The application for a continuance is based upon two grounds: First, lack of opportunity by counsel to prepare the defense; second, absence of material witnesses.

It has been repeatedly held by this court that motions for continuance are addressed to the sound discretion of the trial court, and that the judgment will not be set aside for a failure to grant a continuance unless a manifest abuse of discretion appears. Reed v. State, 14 Okla. Cr. 651, 174 Pac. 800; White v. State, 9 Okla. Cr. 442, 132 Pac. 381; Tucker v. State, 9 Okla. Cr. 587, 132 Pac. 825.

The defendant was a poor person, and on the 6th day of July, 1921, the court appointed W. B. Merrill and J. G. Clift as attorneys to defend him in this prosecution. The case had been previously set for trial on the 11th day of July following. The inability to prepare defense is based upon the proposition that one of the defenses to be interposed was that of insanity, and that, if given an opportunity, counsel would be able to procure the testimony of witnesses residing without the state who would testify that the father of the defendant became insane at about the age of the defendant at the time defendant killed the deceased. The motion was properly overruled as to this ground for several reasons: First, it is not made to appear who these witnesses would be, and where located; second, the materiality of this testimony is not made to appear from the face of the motion; third, it is apparent from the motion that the evidence, if procured, would be cumulative.

As to the second ground stated it appears from the record that one of the witnesses for whom a continuance was asked was produced and testified in behalf of the defendant, and that the testimony of the other witnesses whose attendance is sought was cumulative of that produced at the trial. It is sufficient to state that, considering the motion for continuance as a whole in the light of the record before us, it appears no rights of the defendant were prejudiced, and there was no manifest abuse of discretion on the part of the trial court in overruling the motion.

Next it is contended that the trial court erred in permitting private counsel to appear and assist in the prosecution. No objection was raised to private counsel assisting in the trial at the beginning of the trial. In Reed v. State, 2 Okla. Cr. 589, it was held: "The laws of this state only prohibit persons other than the county attorney or his deputy from performing such acts in the prosecution of crimes as are strictly official, such as appearing before and advising the grand jury, verifying and filing informations, approving complaints, etc.," and it was further held in that case that "the assistance of private counsel in the trial of criminal cases is not prohibited."

The county attorney appeared and conducted this prosecution on behalf of the state. The information was filed by the county attorney, and indorsed by him, and the record shows that all the preliminary steps taken to institute this prosecution were taken by the county attorney, the official representative of the state in that capacity. It was perhaps discretionary with the trial court to require private counsel to state to the court by what authority he appeared, but there is no statute requiring the proceedings in a criminal case to be stayed until such authority is shown such as section 4099, Compiled Statutes 1921, applicable to civil pro-

ceedings.

In view of the fact that the assistance of private counsel in the trial of criminal cases is not prohibited, and in view of the further fact that this prosecution appears from its inception to have been instituted and carried on in the name and by the authority of the state of Oklahoma, and in view of the further fact that it is not contended that there was any misconduct by any private counsel prejudicial to the substantial rights of the defendant, we deem the assignment of error wholly without merit.

Next it is contended that the trial court erred in failing to give an instruction on the law relative to manslaughter in the second degree. We have carefully examined the transcript of the evidence in this case, and fail to find any testimony which tends to reduce the degree of this homicide to that of manslaughter in the second degree.

In Newby v. State, 17 Okla. Cr. 291, 188 Pac. 124, it is held:

"The refusal to give manslaughter instructions in a prosecution for murder is not error, if there is no evidence tending to reduce the degree of the crime from murder to manslaughter in either degree." See, also, Williams v. State, 17 Okla. Cr. 375, 188 Pac. 890; Williamson v. State, 19 Okla. Cr. 430, 200 Pac. 461; Ussaery v. State, 22 Okla. Cr. 397, 212 Pac. 137; Smith et al. v. State, 22 Okla. Cr. 383, 212 Pac. 1012.

Next it is contended that the trial court erred in admitting certain testimony over the objections of the defendant.

This assignment relates to the testimony of certain witnesses introduced by the state in rebuttal for the purpose of impeaching the testimony of the defendant. Certain witnesses were permitted to testify in rebuttal to certain statements

made by the defendant shortly after the killing of the deceased, which statements, if true, were contradictory to the testimony of the defendant given at the trial on matters material to the issue. Testimony of this character is proper for impeachment purposes. Smith v. State, 3 Okla. Cr. 629, 108 Pac. 418; Kuykendall v. Lambert et al., 68 Okla. 258, 173 Pac. 657; Freels v. State, 18 Okla. Cr. 456, 195 Pac. 1094.

The only objection urged to the admission of this testimony is that the question asked the impeaching witness did not conform to the predicate laid. In this connection it is sufficient to state that an examination of the record discloses that the attention of the defendant was first called to the time, place, and persons involved in the supposed contradictory statements or conversations in a manner sufficiently definite to reasonably refresh his recollection, and to call his attention to the substance of the subject-matter and statements upon which it was intended to impeach him. We think the predicate laid sufficient, and, in addition, the trial court instructed the jury that such evidence was introduced solely for impeachment purposes, and could not be considered as substantive proof of any of the alleged facts detailed by the impeaching witnesses in such conversations.

Certain instructions given in the general charge to the jury are contended to be erroneous. We have carefully examined the entire set of instructions, and find that certain of the instructions complained of have heretofore been approved by this court where the issue of self-defense was involved, and further that the instructions as a whole fairly and fully cover the law of the case from every angle; indeed more favorably to the defendant than the evidence probably warranted. The general charge covered the law of the case, and in the opinion of this court was not misleading, contradictory, or unfair to the defendant.

The conclusion is reached that the defendant had a fair and impartial trial; that there is nothing contained in this record to indicate that the defendant could have a more fair trial had the cause been continued to a later term of court; that no reversible error is presented, and that the judgment of the trial court should be affirmed. It is so ordered.

BESSEY and DOYLE, JJ., concur.