### GEORGE GLIDEWELL v. STATE.

No. A-6327. Opinion Filed Sept. 22, 1928.
(270 Pac. 344.)

H. D. Henry and S. A. Horton, for plaintiff in error.

Edwin Dabney, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

DAVENPORT, J. The plaintiff in error, hereinafter referred to as the defendant, was charged in the district court of Greer county with the murder of Edgar A. Jones, was tried and convicted, and his punishment fixed at imprisonment for life in the state penitentiary. Motion for new trial was filed and overruled, and exceptions saved, and judgment was rendered in pursuance of the verdict. To reverse the judgment, defendant has appealed to this court by petition in error, with case-made.

The evidence on behalf of the state tends to show the following facts: Neel Burtcher, called on behalf of the state, stated:

That he lived at Bradley, Okla., in Grady county; that on or about the 13th day of December, 1925, he was at the Perry Hotel, in Mangum; that was on Sunday night; he had known Edgar Jones something like a month; he had only seen the defendant once prior to that time; that on the 13th of December, about 10 o'clock at night, he was down at room 6, Perry Hotel, in Mangum; there were three or four others with him, one boy was called Claud, and defendant's brother, "Claud's last name I learned was Mullins; defendant's brother was S. B. Glidewell, Jr. I was in the room when defendant came in; when defendant went out of the room, he started down the steps and got to the top of the steps, when Daisy Henderson run out and grabbed him, and asked him to pay a dollar and a half, and he said he did not owe her a dollar and a half, and they stood there and argued a good bit; her husband, I think, first come up and said, 'If you owe the one dollar and a half,' to give it to her, and he said that he did not owe her a dollar and a half.

Edgar Jones was there at that time. I did not see Edgar when the woman caught the defendant by the arm; he was there; he was back in his room, but I did not see him. Ed came out and said, if he owed her the dollar and a half, to pay it to her, and defendant said, 'What in hell is this to you?' When defendant said this to Edgar Jones, Edgar said, 'I said, if you owe it to her, pay her,' and the defendant asked for some change; defendant said he did not have any change; he said he could give him two half dollars, and he paid her and went down the steps. I think Claud Mullins was with him; I would not be positive he was. Defendant's brother went down with him; defendant had on a blue suit, white shirt, striped necktie, and a kind of a black hat. I saw the defendant again that night, I don't know just what time it was; it was only about 30 minutes, maybe an hour, after I first saw him. I saw the defendant the second time standing at the head of the steps in the Perry Hotel, leaning up against the wall. It was steps that go up from the east at the Perry Hotel. I don't know the boys' names that were there; there was a curly headed boy, and kid with the blue suit; they were standing there, arguing about some dice. Edgar Jones came out of his room and told them, all that did not live there, to get out; that us boys lived up there, and we did not figure any damned outsiders can come up and run things over us. I did not hear any one else speak to them about stopping the noise. I know Mr. Patterson was rooming in the hotel, but I do not know his room number. I could not tell how many boys were there at the time; there were eight or ten of them, a bunch I know. I don't remember whether Edgar Jones was out of his room, and was talking to the boys, when George Glidewell came up or not. I remember that, when Ed said that, I looked around and seen the defendant standing there, leaning up against the wall, the defendant had his hand in his right coat pocket. When Edgar Jones said those who did not have rooms get out, they all started, and when they started for their rooms George stepped up and pulled his pistol, and started to shooting at Ed Jones. I saw Jones after he was shot, but I did not see him when he fell; there was a whole lot of smoke; the hotel was full; you could not see anything. I could see Jones plain-

ly when he came out of his room. I don't remember who was the first fellow to Jones after he was shot. I believe his name was Claud Martin. I went back to my room and ran out again. Jones was lying on his face near the door of his room, No. 2, which was in the south end of the hall on the south side, southeast; his feet was very nearly even with the door of his room; after Mr. Claud Martin got there, there were several came; I don't know who all. I just saw the bulk of defendant's pistol as he pulled it out of his pocket; I could not tell what kind of a pistol it was.

"I do not know whether the defendant saw Edgar Jones the last time he came up in the hall. I did not hear Edgar Jones say anything to him; there was no statement between either of them in the hall, when the defendant came up the last time; myself, the defendant's brother, and one little short guy, who worked on the pavement down there, was in a game; I don't know his name, and there was another guy down there I don't know, and there was Tommie Watson. We was playing on a bed, the bed sets north and south in the room. Edgar Jones was not in the room at any time that I know of during the crap game; the boys left after the first game, and we went back again and begin shooting dice after they left. We did not play very long the last time, when we broke it up and commenced arguing about the dice. We started the argument and went out in the hall at the head of the stair steps. The defendant, when he came back just prior to the shooting, was at the top of the steps when I saw him; when he shot he was standing at the top of the steps right close to the wall, right where the wall crooks down the steps there. Edgar Jones was leaning up against an old mirror or washstand against the wall, about 2 or 2 1-2 feet from the head of the hall toward the south end, south of the head of the steps. I was north of the defendant and Edgar Jones, something like a couple of feet, I guess, from the defendant, about 4 to 6 feet from Jones; I don't know exactly how far I was. I saw the defendant that night after the shooting. Mr. Tittle seemed to have him under arrest. I recognized him as the one who did the shooting. When I saw him in the sheriff's office, he was dressed something

like he was at the time of the shooting, except he had on a cap; instead of a hat. Defendant made a statement and I asked him if he was the one next to me shooting dice, and he said, 'Yes, sir' he was, and I identified him as the man who did the shooting. He said he was not up there when the shooting was done.

"I am 19 years of age; when the deceased came out of his room that night, he had his pants on, and his underwear, and was bareheaded and barefooted; I did not see any gun on him; his hands were hanging down as he came out of the room; he looked just like he always did. I saw him plainly; he was shot in the heart. I don't know how long he lived after he was shot, but I judge he lived something like three minutes. I did not hear him say anything after he was shot; Claud Martin said something to him, and rolled him over, was all; that was before he died."

On cross-examination, the witness stated:

That his home was at Bradley; that he lived in Oklahoma City and had a cleaning and pressing business; come from Newport, Ark., to Oklahoma City, he was raised partly in Arkansas and partly in Oklahoma; admitted to having paid a little fine in Oklahoma City for loitering around a bootlegging establishment; also was charged with running into a boulevard with a car; he had been in Mangum something over a month prior to this difficulty; did not know whether Edgar Jones was a gun toter or not. "I would not swear the gun presented to me was Edgar Jones' gun, but it looks something like it; I saw a gun like the one presented lying on the foot of the bed after the shooting, which looked like this gun; the foot of the bed where I saw this gun was near the door on the side of the room where Jones fell; only about three or four feet from the foot of the bed, the room was a small room; I know Aber was his roommate; I know what Aber said about it; but I do not know where Aber is at this time. I saw him after the killing; also the time of the examining trial, he was here in Mangum."

Claud Mullins, Claud Martin, and Jasper Patterson testified in substance as to what took place in the hall

just prior to the shooting and identified the defendant as the one who fired the shots. S. H. Tittle and E. W. Reeves testified as to the statement made by defendant to them the next morning after the shooting, about 5 o'clock in the morning, after they had taken him into custody, and had him in jail, where the county attorney was present with a court reporter.

The testimony of all the witnesses called on behalf of the state, who were in the hotel and who saw the killing, tends to show that the defendant and others had been engaged in shooting dice and that the game broke up, and as the defendant left the hotel he was stopped by Daisy Henderson, who demanded he pay her one dollar and a half; the defendant denied he owed her, and Jones, the deceased, came up and told him if he owed her one dollar and a half to pay it; after this controversy the testimony tends to show the defendant paid Daisy Henderson the one dollar and a half and left the hotel, and was gone something like 30 minutes to an hour, and returned to the hotel, where a number of boys who had been engaged in the crap game were having another game; that as the defendant went up the stairs, and came to the head of the stairway, a controversy was on between the boys about the game they had been in, and Jones came out of his room and demanded those who did not have rooms there to leave. The exact language the deceased used differs according to the testimony of the witnesses who heard it. After the shooting the defendant returned to his father's home, and was there when the sheriff and his deputy went out and got him. He made no resistance, and was brought in to the county jail, where the county attorney, the sheriff and deputy, and court reporter had him up early in the morning, about 5 o'clock, and secured a statement, testified to by Tittle and Reeves.

The defendant took the stand in his own behalf and in substance testified as follows:

That his name was George Glidewell; he was 30 years of age; he resided about three miles east of Mangum; had been living there about four years; came from Texas about six years ago; had worked on the farm with his father; did not farm in 1925; was in California in the spring and part of the summer, working at a paving plant; that he did not know the deceased, the first time he ever saw him was that night in the game. "Bob Phillips was telling me they had a crap game at his room, and I went to the hotel. I do not make a living by gambling; never have been a regular gambler. I have gambled some in a social way; I played in the game that night. The deceased played some that night. Jones would shoot a time or two and then get up and go out. This woman that was standing over there, this tall woman I learned since was Daisy Henderson, she came to the window and stuck a pistol through and said, 'Stick your hands up,' or something like that; that was the woman they called Daisy Henderson. Just in a little bit Jones came in, and I got the shape of a gun down like that (illustrating). 'I ain't tough; I come from where they get tough;' and this woman looked up at me and says, 'You just as well give me that dollar and a half,' or 'Come out and give me that dollar and a half; I am laying for you anyway,' and he looked over at me and said, 'He is going to pay you that dollar and a half.' He had his hand inside of his shirt; the woman was talking through this little window; I knew at that time he had a gun in his bosom; he was standing with his left side to me. I disputed with the woman about owing her. We played on a while, and the game broke up, and we all started out. I had gone about a step out of the door of the room when this woman grabbed my left arm and told me to give her the one dollar and a half, which she said was for watching for this game, and I said, 'Am I going to have to pay the whole bill for watching to-night;' and she said it was not that; 'It is for staking you and Black in the poker game;' I said, 'You must be mistaken; I don't owe you a dollar and a half'; a man who claimed to be her husband said, 'You give her that dollar and a

half.' Jones come up from down below, and just as he got to the head of the stairs, and got even with me, he done his hand down from his gun and got a long breath, and looked up at me, and walked across to the west side of the hall, and turned around, with his right side against the wall and his left shoulder down the stairway; the woman kept telling me to give her the dollar and a half; I said, 'I don't owe you a dollar and a half;' and he said, 'Give the woman a dollar and a half.' He had his hand on the inside of his shirt where the gun was. I said, 'Fellow, I don't owe her a dollar and a half;' he said, 'Give her a dollar and a half,' and pulled out the gun, so I could see about that much; I said, 'Anybody got change for a dollar?'

"The gun here looks like the gun Jones had; my brother, S. B. Glidewell, Jr., was there near me, he told me to give her the dollar and a half and 'let's go on down;' I call him John, but his correct name is S. B. Jr. My brother was nervous like; after I gave up the dollar and a half, and went down stairs, I went up the street and turned at the Richard drug store and went over to Pete Salina's cafe. Me and John, I believe, was the only ones that went around; when we left Pete's cafe we rode around; I don't remember just where we went. I saw my car go down the street, and I told them to let me get out; we went out home. I got a gun out there; the statement of the officers that I told them I got a gun out there is something like correct; when I went out to the house I went for the purpose of getting some more money to go back and play in the game. I was loser. I did not think of killing the fellow at that time. I had not told Claud Mullins I was going to kill Jones before morning. I never did ask Claud Mullins to swear any thing that was not true for me. I did afterwards ask him to swear that Jones had a gun; after I come home I called him out in front of the car and said, 'Claud, will you swear this man had a gun?' I meant to ask him if he could swear he saw a gun. Claud struck out his hand and wanted to shake hands with me. I said, 'There is no use of that; if you saw the man with a gun, you go swear it;' he said, 'I am your friend; I will swear it.' this conversation took place after the shooting; I don't know what I took the

gun back to town for; at that time I did not know where the fellow was, where he stayed or anything about him. I didn't know whether he was just up there like I was or not. I don't know where he stayed; the first time I saw him was at the game that night. The pistol I had was a 39 Colt's police positive; it was double action, single, either one; after the shooting I threw it down just after I came out of the hotel, near the Willys-Knight garage; it was the garage next to the hotel. When I went home I wore a hat; when I came back to the hotel, I went up the stairs, and stopped at the head of the stairs. I did not know these people were up there and that they were arguing in this way. I did not know who all was up there. I just stopped and looked at this other fellow, who was talking to some one; this fellow Jones. I did not know what to do, whether to go back down stairs or to stay. I stayed there about three, four or five minutes. I never said a word; I just listened to the argument, and it seemed like, as soon as he noticed me, it looked like it went all over him; the way I understood him, he said, 'You God damned son of a bitch, you better get, and get now,' or 'move now'—something like that. I could not see all of his body at this time. there was another fellow between us. I think it was Ludie Wyatt; he was standing down toward the southeast room, halfway toward where the staircase is. I did not know whether he had a gun or not. I wanted to get to this game to play some more; they seemed to be quarreling, and Jones was trying to get them to go down, or something of that kind.

"Just before I shot, he was talking to this fellow, and it looked like, just as soon as he looked at me, it went all over him. I understood he was talking to me. He said, 'You God damned son of a bitch, get, and get now.' He just moved back his right hand; I could not see his right shoulder; I could not see his right hand. When I saw him move his right shoulder, I thought he meant to do just what he had been doing all night. I thought, if he pulled his gun, he would shoot, and I figured, if he got the gun out, he would shoot. I had not gone up there for the purpose of killing Jones, or having any trouble with him. I would not have shot him, if I had not thought he was going to use the gun I saw him

have. I could have shot him when he was talking to this other fellow, if I wanted to; if he had not said nothing, I would not have shot. I made a statement in the jail when Mr. Tittle, Mr. Reeves, and Mr. Thacker, the court reporter, was present; it was about 5 o'clock in the morning following this occurrence; it was before daylight. I was down in the jail office; none of them advised me I had the right to have counsel or friends present to advise with me before they took me down into the jail to get the statement; when the woman was wanting me to give her the dollar and a half, she said something about the fellow in the front room here, in room No. 2, will see that you pay, and I said, 'Don't call any one; I don't want any trouble.'

"I talked to Claud Martin at the cafe the night before the shooting. I told him something like he said; I did not want any trouble with any one and would not have it, if I could keep from it."

Upon cross-examination by state representative, the witness stated:

He knew the use of a gun; that he was considered a good shot with a rifle; that he had had experience during the war. "I went out home and got the gun; I just figured this way, he was a fellow that had a gun, and he had. I did not expect to use it unless this fellow went to use his; that is the way I figured it. I did not room at the Perry Hotel, and had no business there, except to join the others in shooting of dice; after I came back I knew there was a game on at the hotel. I had only been in one game that night at the hotel; when I went back they were not playing, but had been playing; when I come up the second time there was a bunch out in the hall; when I quit the first time I had $3 or $4 in my hand and gave one dollar and a half to the woman; the limit that night was 50 cents. I had not been drinking liquor that night; I drank some about 2 o'clock that day and had eaten supper; when I went up the hotel steps the second time, there was several of them down this way (indicating on the north side of the stair). Ed Jones was just on the west side, one fellow to my left. Ludie Wyatt was standing with him; the first shot I fired was in a

southwestern direction; somebody ran against me and hit me, and it kindly knocked me further out in the hallway; I was then shooting kindly south; Jones begun to fall at the second shot; I could not say how many times I did shoot; the deceased turned right to me; he did not call my name when he was talking; I could not tell where Paul Wyatt was at the time; I don't remember where Claud Martin was; after I come up to the edge of the stair, this fellow was walking down the hallway; I did not get my pistol when I came up the stairway. I had the pistol in my right coat pocket; I did not walk out home that night; I had on a hat when I shot the deceased; when I went up stairs, and before the shooting began, I was standing on the hall floor; I was not on the steps; I was on the hall floor; I do not remember how many boys were there at Pete Salina's talking. I told Claud something about what the woman had demanded of me down at the hotel; he was the only one I remember telling about it; I don't remember telling Ludie Wyatt anything about it; I intended to be peaceful and quiet, and not have any trouble; I figured the way he was doing he would use his gun if he run onto me; I don't remember telling the sheriff down there, in the statement that was written there in the jail, that the deceased did not do anything to me, after I went up the last time, and he laid eyes on me, he cussed and said just what I said a while ago."

The state further examined the defendant with reference to other fights and fines that were imposed on him for driving a car and being intoxicated, evidently for the purpose of discrediting the defendant's testimony before the jury.

A number of other witnesses were called, who testified they were present in the hall, and who testified as to the demand of the woman of the defendant to pay her the dollar and a half, and to what the deceased said when he took part in the controversy when the defendant was upstairs in the hotel the first time. Before the close of the testimony the statement of the defendant, that was taken at 5 o'clock in the morning, in the presence of the

county attorney, sheriff, deputy, and court reporter, was introduced to show the correct statement made by the defendant, at the office of the jailer.

The rebuttal testimony of the state discloses the fact that the county attorney went to the jail and aroused the defendant at an early hour in the morning, and insisted upon the defendant making a statement as to what had taken place prior to and leading up to the shooting. At the time the county attorney, together with the other officers, demanded this statement of the defendant, the defendant had not had an opportunity to consult with his father, brother, or any of his friends. No reason is assigned for such haste, nor is there any reason why the county attorney and the sheriff should arouse the defendant from his bed of slumber and insist, if not force him, to make his statement as to what had taken place.

It is an unusual act upon the part of the officers, who are charged with the duty of correctly enforcing the law, who also are presumed to know that the defendant has constitutional rights, and that he is entitled to have the advice of counsel, or to consult with his friends before being called upon to make a statement. It is further disclosed by the record that the following morning, after the county attorney, the sheriff, and court reporter had gone to the jail and secured a statement of the defendant, counsel, who had been employed to defend the defendant, applied at the jail to see the defendant, and the sheriff kept counsel waiting until in the afternoon of the morning, giving as an excuse that his jailer was asleep, and that the sheriff was too busy to permit counsel to see defendant. The fact that the sheriff did not permit counsel to see defendant at once, after he had applied, and kept him waiting, did not prejudice the defendant's rights before the jury; yet we feel that the sheriff should have acted more promptly, and given

counsel for the defendant an opportunity to at least have seen his client, that he may have been properly advised of his rights under the law.

One of the grounds of the defendant's motion for a new trial, and assigned as error, is that the court erred in refusing to grant a continuance. When due diligence is shown, a continuance ought always to be granted, when from the showing justice requires it to be done, in order to enable the defendant to procure all competent evidence to prepare a proper defense. La Coss v. State, 25 Okla. Cr. 130, 219 P. 416; Grall v. State, 26 Okla. Cr. 132, 22 P. 701. A continuance should only be granted in order that justice may be done, and not in order to enable a violator of the law to escape. Ross v. State, 34 Okla. Cr. 363, 246 P. 645.

The question to be decided by this court is: Did the trial court abuse its discretion in denying this application for continuance. The record discloses that the witness Aber, whose absence is one of the grounds for continuance, was rooming at the Perry Hotel at the time of the commission of the homicide, and was claimed to be the roommate of the deceased; the killing occurred on December 13, and defendant was arrested that night, and was formally charged with the commission of the crime by preliminary complaint on December 15, 1925. His preliminary examination was set for December 18, 1925. The testimony introduced on the hearing of the motion for continuance shows that the witness Aber was present in Mangum at the time of the preliminary examination, and that the defendant knew that to be a fact; that the state did not call Aber as a witness against defendant, and that the defendant did not call Aber as a witness, at the preliminary trial, notwithstanding the record shows that he was there in Mangum at the time; that the information was filed in the district court, and the

list of witnesses the state intended to use against the defendant was served on the defendant on January 7, 1926; that Aber's name was not indorsed thereon; that on January 8, 1926, the case was set for trial for 9 o'clock a. m., January 25, 1926; and the defendant did not get in touch with Aber between the time of the preliminary and the date of the trial. The defendant did not cause a subpoena to be issued for Aber until the 21st day of January, which was returned on the same day, showing that he could not be found in Greer county. The defendant's case was on the 8th day of January, 1926, assigned for trial on January 25, 1926.

Notwithstanding the fact that the defendant knew for more than two weeks his case had been set for trial, he waited until four days before the day of the trial to have a subpoena issued for Aber. Defendant failed to show, in his motion for continuance or his testimony in support of the same, that he had any knowledge where Aber was, or that he could secure his attendance by the next term of court. No showing whatever is made that his attendance could be procured at a subsequent term of court. The motion for continuance and testimony in support of the same fails to show sufficient diligence on the part of the defendant to secure the attendance of Aber, and therefore the court did not abuse its discretion in denying to the defendant a continuance. Rose v. State, 8 Okla. Cr. 294, 127 P. 873; Moseley v. State, 12 Okla. Cr. 402, 157 P. 708; Collins v. State, 15 Okla. Cr. 96, 175 P. 124.

It is next argued by the defendant that the trial court erred in excluding certain competent and material evidence offered by the defendant. This question presented by the defendant is discussed at length in his brief, and relates to the refusal of the trial court to permit a copy of the statement made by defendant in the jail early

on the morning after the killing, to the county attorney, in the presence of the sheriff and other officers, and the defendant urges that this is such an error as would justify this court in reversing the case. The record discloses that the court did prohibit the statement being introduced in the early stage of the trial, but that later on in the trial, when the sheriff had been questioned with reference to certain statements, the representative of the state raised no objection, and the entire statement was introduced; therefore this objection of the defendant is without merit.

The third assignment argued by the defendant is that the punishment fixed by the jury is excessive and should be reduced. The defendant in this case was informed against, charged with murder, and the jury by its verdict found the defendant guilty of murder, and fixed the punishment at life imprisonment. this being the minimum punishment under our statute for murder.

The record in this case discloses that the defendant had a fair and impartial trial; that there were no errors committed by the trial court prejudicial to the rights of the defendant; that the testimony is sufficient to sustain the verdict of the jury. There are other errors assigned by the defendant, which have been given careful consideration, and found to be without merit.

The judgment is affirmed.

DOYLE, P. J., and EDWARDS, J. concur.