## W. G. MARTIN v. STATE.

No. A-8931. Nov. 8, 1935.
(51 Pac. [2d] 584.)

188

R. H. Brown, and C. A. Greenlees, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

DAVENPORT, P. J. The plaintiff in error, hereinafter referred to as the defendant, was convicted of manslaughter in the first degree, and his punishment fixed at imprisonment in the state penitentiary for a period of seven years.

The testimony on behalf of the state shows that the defendant was a resident of Cotton county, on October 9, 1935; that he was cultivating a portion of a farm belonging to a man by the name of Telford, which was located in the south part of Stephens county, the west line of the farm being the dividing line between Stephens and Cotton counties; the said farms being located about five miles northeast of where the defendant lived in Cotton county.

It is further shown that a man named Clark had entered into a contract with the defendant to cultivate the Telford farm of eight acres; that Clark was cultivating 20 acres and the defendant 60; a creek ran through the farm dividing the part Clark was to cultivate from the land the defendant was to cultivate; Clark was to have about an acre as a garden on the east side of the creek. It is further shown that in the summer of 1934 Clark got into some kind of trouble and was sent to the penitentiary; and the deceased, Ellis Nail, by and with the consent of the defendant, was occupying the house Clark had lived in on the Telford farm and was to look after Clark's crop. On Saturday, October 6, 1934, Nail had cut for harvest a small portion of some kaffir corn on the west side of the creek; on the following Monday, the 8th of October, 1934, the defendant went to the farm and learned that a portion of the kaffir corn had been cut. It is admitted by the defendant when he went to the field to load the kaffir deceased had cut to haul it to the farm in Cotton county, he had his pistol with him.

It is further shown that on the 9th day of October, 1934, the defendant again went over to the farm, and on the west side of the creek, for the purpose, as he claims, of cutting some Johnson grass in which his landlord Telford had an interest; he arrived at the place about 8:30 in the morning, again having his pistol buckled on his person under the bib of his overalls; shortly after he arrived at the farm, the deceased, Nail, came up to where the defendant and his two sons were getting ready to cut the grass with their mower, and after a few words passed as to the right of the deceased to the kaffir corn he had cut, which had been hauled away by the defendant, the deceased claiming the kaffir corn belonged to Clark and he had a right to cut it because it was Clark's, the defen-

dant denying that statement, claiming Clark never planted it, that it was volunteer kaffir corn, and that he had a right to take it, although it was over on the west side of the creek, on land the defendant testified Clark was to have; some angry words passed from the defendant to the deceased, and deceased hit the defendant in the face with a stick which he had in his hand; as claimed by the defendant, the blow staggered him back against the machine or team that was near the machine.

The only eyewitnesses to the shooting were two sons of the defendant. No statement was made by the deceased as to how the trouble arose. In the trial of the case, the defendant testified that after deceased struck him with the stick he backed off a few steps, and he asked the deceased to stop and reason the matter out, and the deceased started to reach his hand in his overalls, and at the same time stating he would reason it out with his gun; the defendant claimed when deceased did this he pulled his gun from the scabbard under the bib of his overalls and shot at the deceased twice; one of the shots struck the deceased in the back, from which wound the deceased died about a week later.

Dr. James L. Patterson testified as a witness for the state that the deceased, Ellis Nail, was brought to his hospital in Duncan, on the 9th day of October, 1934, about 11:30 a. m. That the deceased was suffering from a gunshot wound that penetrated his right side and extended to the spinal cord and to the lung; it ranged slightly from the left to the right; that the deceased died later from the gunshot wound.

On cross-examination, the doctor stated that the bullet went just inside of the shoulder blade, through the spinal cord, severing the cord and on into the lung; the deceased

lived about a week after he was brought to the hospital.

Earl Russell, sheriff of Stephens county, stated he went to the place where the trouble occurred, and found the defendant and asked him if he shot Nail, and defendant replied that he had; that the defendant was working on his mowing machine or around the mowing machine, and had a team to the machine; "the place where the defendant showed us the difficulty took place was north one-half a mile and east, maybe further than a quarter, right in the section line running east and west where there was a gate leading into the field; we asked the defendant if he had a gun on his person, and he hesitated a little before he told us where the gun was; he afterwards showed it to us in his wagon; it was in a scabbard at the time; the gun presented is the gun he showed us. The gun was full of shells when given to me. Defendant said he shot at Nail twice. The defendant's two sons were with him when we drove up, ages 18 and 21; he showed us the stick he claimed the deceased hit him with before he shot the deceased; he showed us where the deceased was standing, when he made about six steps toward deceased, and as there was a tree the deceased went around the tree and he had to come out from behind the tree before he shot him. As shown us, the place was anywhere from four to six steps. There was quite a little gash and a little blood on the defendant Martin's face when we got there; he said it was caused from the deceased Nail hitting him with the stick."

The record further shows that shortly after the deceased, Nail, died, the defendant made a statement to the county attorney, in the presence of the sheriff, an undersheriff and a deputy, which statement was taken down by the stenographer in the county attorney's office.

In this statement no mention is made about the deceased reaching into his overalls as though to use a gun. The defendant said the deceased stated when he started to leave he would get his gun and come back and kill the whole bunch, and that thereupon he shot the deceased. The wife of the deceased testified that the deceased did not own a pistol, and never had carried one, and had no gun on him the day he was killed.

The defendant and his two sons testified in substance to the same facts, each contending that after the deceased struck the defendant with a stick he stated he would get his gun and kill the whole damned outfit, and ran his hand in his bib overalls, and then the defendant began firing.

The statement given by the defendant shortly after the death of the deceased is very different and contradictory to the testimony given by the defendant on the witness stand in his own behalf, and by his sons, who testified in court. The physical facts showing where the bullet took effect in deceased's body contradicted the statements of both defendant and his sons as to what the deceased was doing at the time the shot was fired. The record shows that after the deceased was shot and fell in the edge of the section line the defendant and one of his boys picked him up and put him in the wagon preparatory to taking him to a doctor; that deceased asked the defendant and his boys if they were going to take care of him, and they told him they were; about that time some gentlemen drove up in a car, and the defendant or the deceased, or both of them, asked them to take him to the doctor, which they did.

The record further shows that defendant went on with his hay cutting without reporting to the sheriff or going with the deceased to see whether or not he was being

properly cared for. The foregoing is in substance the testimony of both the state and the defendant as to the circumstances leading up to the shooting, and at the time of the shooting, and up until the time he was arrested by the officers where the difficulty occurred.

The defendant in his petition has assigned ten errors alleged to have been committed by the trial court, which he insists are sufficient to warrant a reversal, and has grouped together in one proposition his first, second, third, and fourth assignments of error, which are as follows:

"1st. Error of law occurring at the trial.

"2nd. Error of the court in admitting testimony on behalf of the state, defendant in error, that was incompetent, irrelevant, immaterial and highly prejudicial to the rights of the plaintiff in error.

"3rd. The court erred in thereafter permitting the county attorney in the presence of the court and jury, in the trial of said cause, to hold said written statement in his hand and to cross-examine plaintiff in error, and asking plaintiff in error, if at the time he made the purported statement certain questions were not asked him, and certain answers made by him."

The defendant insists that the court erred in permitting the county attorney, over his objections, to inquire of the defendant on cross-examination, while the defendant was testifying in his own behalf, and to ask him when he made the statement in the county attorney's office shortly after the death of the deceased if he did not make certain statements as to what took place at the time of the difficulty, and the defendant urges that the action of the county attorney by permission of the court in asking the questions with reference to the statements made by the defendant in the county attorney's office shortly after the death of the deceased was prejudicial to his rights and was sufficient to warrant this court in reversing his case. Cit-

ing in support of his contention, Foster v. State, 8 Okla. Cr. 139, 126 Pac. 835.

After a careful examination of the case cited by the defendant, we fail to find that the issues in the case cited are similar to the issues in the case cited are similar to the issues in the case we are considering. The question there was a question of the admission of certain records in another proceeding which involved the question of the custody of an infant child, about which the controversy there arose.

In this case the defendant was on the witness stand testifying in his own behalf, and on cross-examination was asked by the state if at a certain time he did not make a statement in the county attorney's office, which was taken by a stenographer, although the questions and answers written out had not been signed by the defendant. The inquiry as to the statements made to the county attorney, in his office shortly after the death of the deceased, was made for the purpose of impeaching the statements of the defendant made while on the witness stand in his own behalf. When the defendant takes the witness stand in his own behalf, he thereby subjects himself to the same rules respecting cross-examination as applied to any other witness, and may therefore be cross-examined, and be discredited or impeached in the same manner as other witnesses may be discredited or impeached. Richards v. State, 12 Okla. Cr. 224, 154 Pac. 72; McNeill v. State, 18 Okla. Cr. 1, 192 Pac. 256; Queen v. State, 23 Okla. Cr. 146, 147, 212 Pac. 1021; Whitlow v. State, 24 Okla. Cr. 307, 218 Pac. 162.

The fact that the questions propounded by the county attorney to the defendant while on the witness stand may be embarrassing to him do not entitle him to a reversal where such questions are material to the issue.

In Cody v. State, 23 Okla. Cr. 236, 214 Pac. 201, this court held:

"Where a witness is sought to be impeached by showing that the testimony given by him at the final trial is in conflict with that given at the preliminary or some other trial, the attention of the witness must be called to the particular facts concerning which a discrepancy is sought to be shown. Under such circumstances it is not error for the court to refuse to permit the introduction of the entire testimony of the witness given at the preliminary trial." La Coss v. State, 25 Okla. Cr. 130, 219 Pac. 416; Morris v. State, 30 Okla. Cr. 382, 236 Pac. 443.

In Crain v. State, 24 Okla. Cr. 343, 217 Pac. 888, this court held:

"Where an attempt is made to impeach a witness * * * by showing that at another time he made a different or conflicting statement as to the circumstances of an affray, some foundation should be laid for the introduction of such impeaching testimony, specifically calling his attention to such discrepancies in order to afford the witness an opportunity to explain or deny the impeaching testimony."

The defendant knew better than any one what statements he had made to the county attorney, and he had a perfect right to explain that testimony, if he could consistently with his innocence. The county attorney only attempted to cross-examine the defendant upon inconsistent statements, which statements related to the issue of self-defense, an important ground relied upon by the defendant for an acquittal. His entire defense rested upon the truthfulness as to what he said relative to the issue of self-defense.

In Flohr v. Territory of Oklahoma, 14 Okla. 477, 78 Pac. 565, 572, the Supreme Court of the Territory said:

"Upon the trial of the case a witness by the name of Hawkes was called by the territory. It appears from the

record that the witness was a stenographer, and had taken the testimony in the case of Kansas v. Richards and Richards, at Wichita, Kan., in the trial of which case the defendants, Charles Flohr and Emma Flohr, were witnesses. The witness Hawkes, when placed on the witness stand, testified to certain questions propounded to Flohr in the trial at Wichita, and the answers given by him thereto. This testimony was offered for the purpose of impeachment, and upon cross-examination he was asked if he had his shorthand notes taken at the trial, and answered that he had. He was then asked to read from the notes the balance of the testimony given by Charles Flohr and Emma Flohr at that trial, other than that he had already given. The question was objected to on the part of the territory, and the objection was sustained. We think the ruling of the court was correct in this respect. This offer was too general."

This court holds that the county attorney was within the bounds of legitimate cross-examination in conducting the same as he has in this case; no contention being made by the defendant or his counsel that the statement which he made to the county attorney on the 18th day of October, 1934, was an involuntary statement.

It is further contended by the defendant that his motion made before the commencement of the trial by requiring the county attorney to furnish him a copy of the statement made by the defendant, in the presence of the county attorney and others, on October 18, 1934, should have been sustained by the court. This contention is without merit. The memorandum statement made by the defendant in the county attorney's office was not offered in its entirety, and the only questions propounded by the county attorney were for the purpose of impeaching him and showing that he made statements outside of the court different to what he was testifying to in the trial. To sustain his position, the defendant cites section 318, O. S.

1931, which is a provision of the Civil Code, and has no application to the question herein urged and insisted upon by the defendant. By no interpretation can it be made to apply to the questions involved here. The record fails to show that the county attorney attempted to introduce the statement as evidence against the defendant, and only cross-examined the defendant as to certain questions and answers given by him contradictory to his testimony given at the trial.

The third proposition of the defendant is included in his second proposition with reference to the statement made by the defendant in the county attorney's office shortly after the death of the deceased. The fact that the county attorney held the statement in his hand during the argument in no way whatever prejudiced the rights of the defendant. Further, this court has repeatedly held that objections to the argument of the county attorney complained of by the defendant will not be considered unless they are included in the recitals made by the trial judge, and unless they also set out the language used by the county attorney and show that the same was excepted to at the time. Gaines v. State, 18 Okla. Cr. 525, 196 Pac. 719; Richards v. State, 22 Okla. Cr. 329, 211 Pac. 515; Newcomb v. State, 23 Okla. Cr. 172, 213 Pac. 900.

It is next urged by the defendant that the case should be reversed and the judgment set aside for the reason that the jury separated before the final submission of the case. It is not disputed that on the first day of the trial. after the jury was impaneled and sworn and placed in charge of two bailiffs, that the jury separated, one part of the jury being under the direct supervision of one bailiff, and another part of the jury under the direct supervision of the other bailiff.

It is further shown that the trial court learned of

this separation after the verdict had been returned, and immediately examined each juror in open court as to whether anything had occurred which in any way tainted the verdict, and each of the jurors testified they had talked to no one about the case, and had violated none of the admonitions of the court with respect to the case except the mere fact of separation. This court has held upon the question of the separation of the jury before the final submission of the case that the burden is on the defendant to show prejudice, but if the separation is after final submission the burden is on the state to show that no prejudice in fact resulted. Hile v. State, 54 Okla. Cr. 137, 15 Pac. (2d) 1049.

The record has been carefully examined and studied, and we hold that the evidence is sufficient to sustain the verdict and judgment; that the defendant was accorded a fair and impartial trial; that the court properly instructed the jury as to the law applicable to the facts; and that there are no errors in the record warranting a reversal. The judgment is affirmed.

EDWARDS and DOYLE, JJ., concur.